## COMMONWEALTH *vs.* JULIO COSME.

Middlesex. May 8, 1991. - July 17, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Homicide. Insanity. Practice, Criminal*, Argument by prosecutor.

At a murder trial, certain statements in the prosecutor's closing argument, taken as a whole and in the context of the actual trial and the jury instructions, created no substantial risk of a miscarriage of justice. [750-755]

No reason appeared in a murder case for this court to exercise its power under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial. [755-756]

INDICTMENTS found and returned in the Superior Court Department on December 14, 1983.

After remand reported in 398 Mass. 1008 (1986), and allowance of a motion for a new trial, the case was retried before *John Paul Sullivan*, J.

*Charles K. Stephenson* for the defendant.

*Catherine E. Sullivan*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree of his brother, murder in the second degree of his girl friend, and unlawfully carrying a handgun. Represented by new counsel on appeal, the defendant argues that the prosecutor's closing argument gave rise to a substantial likelihood of a miscarriage of justice. We reject this contention. We also conclude that there is no reason to exercise our power under G. L. c. 278, § 33E

(1990 ed.), to reduce the conviction of murder in the first degree to second degree or to order a new trial.[1]

The underlying facts of the crimes are essentially undisputed, and we recount them in brief. The defendant had lived with his girl friend, Carmen Milagro Pineiro, for approximately six years prior to the fall of 1983. Some weeks before the murders, the defendant's brother, Doel Cosme Figueroa, moved into the apartment with the defendant, Carmen, and their children. Difficulties developed between the defendant and Carmen and Doel, the defendant apparently becoming jealous over Doel's relationship with Carmen. About six weeks before the murders, Carmen ejected the defendant from the apartment.

Sometime thereafter (about a week prior to the murders), the defendant purchased a revolver and ammunition. On October 2, 1983, the defendant spent most of the day at the apartment of Carmen's mother, discussing his situation. Carmen's mother tried to persuade the defendant to return to Puerto Rico. As he left, however, the defendant said, "I know what I'm going to do." Later that day, the defendant arrived at Carmen's apartment. Both Carmen and Doel were there. Carmen refused the defendant entry, and angry words were exchanged between the defendant and Carmen and Doel. The defendant then went outside to Doel's truck in the parking lot. He disabled the truck by removing the ignition cables, then went to get his car. Seeing this, Carmen, Doel, and the children went outside.

While the group was gathered around the truck, the defendant returned in his car. Three times the defendant drove around and parked near the group and got out of the car. The first two times, the defendant glared angrily at Doel and Carmen, and Doel told the defendant in substance that the defendant would have to kill both him (Doel) and Carmen.

---

[1]This is the second trial of the defendant on these charges. An earlier appeal to this court was remanded for an evidentiary hearing which resulted in a new trial. At that time, this court did not reach the trial issues, or consider the case under G. L. c. 278, § 33E. See *Commonwealth* v. *Cosme*, 398 Mass. 1008 (1986).

After each of these two confrontations, the defendant temporarily left the area. When the defendant returned the third time, the same confrontation occurred. Rather than leaving this time, the defendant returned to his car, removed his revolver, then approached Doel and shot him four times, including once in the head. The defendant then chased the fleeing Carmen and shot her twice, including once in the head. Both Doel and Carmen died of their wounds.

The defendant's revolver was of single action design, so the defendant had to pull the revolver's hammer back manually each time that he fired it. Three and one-half pounds of pressure was required to pull the trigger. Thus, for each of the six shots fired, the defendant pulled the hammer back fully and exerted the necessary pressure on the trigger.

After the shootings, the defendant fled in his car, discarding the gun, a bag of bullets, and a holster nearby. The defendant spent the hours after the shootings but prior to his arrest with a friend who assisted the defendant in moving his car out of the area and transferring it to another owner. The defendant told his friend that he had shot his brother three times and his girl friend twice, and that he was sure that his brother was dead, but he was not sure about his girl friend. During this time, the defendant appeared "peaceful" and "normal," and there was nothing unusual about his behavior.

In addition to the testimony that established the facts just summarized, there was expert testimony concerning the issue of the defendant's criminal responsibility. In support of his argument that he lacked the ability to conform his conduct to the requirements of the law, the defendant called two expert witnesses.

The defendant's first expert witness was Dr. Vernon Mark. Dr. Mark, a neurosurgeon, testified to the defendant's history and the results of tests that he had administered to the defendant in 1987 and 1989. Dr. Mark indicated that the defendant sustained a head injury as a child, had little formal education, and suffered from chronic, severe headaches. Testing revealed that the defendant had substandard mental function. There also was some evidence of abnormal electri-

cal activity in the brain. From this information, Dr. Mark concluded that the defendant had abnormal brain functions in his frontal lobe, the seat of, among other functions, an understanding of the consequences of one's actions. Dr. Mark expressed no opinion on criminal responsibility.

Dr. Jonathan Lieff, a neuropsychiatrist, also obtained the defendant's history and performed a battery of tests in 1989. Based on his examinations, Dr. Lieff testified that the defendant had a very "rigid and constricted" personality (consistent with his head injury), and lacked the ability to control his conduct when angered and to avoid acting impulsively. Thus, at the time of the shootings, although the defendant appreciated the wrongfulness of his conduct, he was, in Dr. Lieff's view, unable to control his aggression and conform his conduct to the requirements of law.

The Commonwealth presented the expert testimony of Dr. Martin Kelly, a psychiatrist. Based on his review of the defendant's records, including legal records and those examined by the defense experts, and an interview of the defendant, Dr. Kelly concluded that, at the time of the shooting, the defendant did not have a serious mental disease or defect that would impair his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Dr. Kelly explained that neurological damage does not necessarily indicate the existence of a mental disease or defect; the crucial question is whether the person's behavior, thoughts, moods, or interaction with others is affected. Dr. Kelly concluded, based on the defendant's conduct before and after the shootings, that the defendant was able to make choices and was able to conform his behavior and conduct to those choices. In Dr. Kelly's view, the choices may have been unwise, and the defendant might now regret them, but they made sense at the time within his understanding of the situation between his girl friend and his brother.[2]

---

[2]Dr. Kelly also concluded that the defendant's intelligence was within the average range. Dr. Kelly accepted a score of eighty-nine on a "performance" test and rejected lower scores that depended on the defendant's

1. *The prosecutor's closing argument.* During his closing argument, the prosecutor attacked the testimony of the defendant's expert witnesses. The defendant argues that many of the prosecutor's statements were so improper that a new trial is required.

The prosecutor's statements that have been singled out for criticism by the defendant are set forth in the Appendix to this opinion in the context in which they were made. We have added numbers in brackets before each passage in which a criticized remark appears for purposes of more easily identifying matters in the discussion to follow. The statements were not objected to by the defendant's trial counsel. Our inquiry is limited to whether the prosecutor's argument created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Sullivan, ante* 521 (1991). *Commonwealth* v. *Colon,* 408 Mass. 419, 444 (1990). *Commonwealth* v. *Roberts,* 407 Mass. 731, 736 (1990). *Commonwealth* v. *Glass,* 401 Mass. 799, 805-807 (1988). See also *Commonwealth* v. *Kozec,* 399 Mass. 514, 518 n.8 (1987). In deciding that question, we apply the following standard, recently stated in an opinion considering an allegation of prosecutorial misconduct in a first-degree murder case. "In examining remarks made during closing arguments for overreaching, this court considers the remarks in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial. *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 746 (1990). *Commonwealth* v. *Lamrini,* 392 Mass. 427, 432 (1984). 'The prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom.' *Commonwealth* v. *Paradise,* 405 Mass. 141, 152 (1989). *Lamrini, supra* at 431. Counsel may attempt to assist the jurors in analyzing the evidence by suggesting what conclusions they should draw from the evidence. *Lamrini, supra* at 431. *Commonwealth* v. *Ferreira,* 381 Mass. 306, 316 (1980)." *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 553

---

very limited background and schooling. He also stated that the defendant's functioning and behavior demonstrated no lack of understanding.

(1990). We conclude, for the following reasons, that the defendant has not demonstrated the existence of a substantial likelihood of a miscarriage of justice.

First, the prosecutor was entitled to make fair reply to the argument of the defendant's trial counsel about the weight to be given to the testimony of the defendant's experts. In that argument, defense counsel essentially told the jury not to try to understand the fine points of the testimony of the defense doctors "because a lot of what they said was in medical terms that none of us understand," and he urged them to accept the doctors' conclusions solely because of their impressive credentials.[3] The prosecutor was thus faced with the task of countering the aura of scientific invincibility that de-

---

[3]The argument of defendant's trial counsel on this point proceeded as follows:

"You have to look at the testimony of Vernon Mark. You don't have to understand it. You just have to look at him, think of where he's been in his life. Ask yourself, does Vernon Mark take life seriously? Did Vernon Mark accomplish certain things during his life? Did Vernon Mark sit in front of you yesterday as an accomplished professional neurologist and neurosurgeon? Do you think Vernon Mark would come in here and say what he said, knowing his function in this case?

. . .

"And in the same vein, you have to assess Dr. Jonathan Lieff. Each of those doctors, as they approached their task, that is, to examine him, gathered together, I think they said — Well, I forget the numbers. One of them said four or five doctors, another one said four or five doctors, Each of their doctors — those doctors conducted a series of tests that took 20 to 25 hours. So you have each of those doctors basing their opinion on 40 to 50 hours of testing.

"You have to — You don't have to understand what they said because a lot of what they said was medical terms that none of us understood. But when you — And that's the key here. You don't have to go in there, into the jury room, and say, yeah, I understand how someone could be so angry that they lose their ability to control themselves. That's not what those doctors were saying. And I implore you not to make analogies to situations where we all find our-

fense counsel had tried to create. He attempted to do this by arguing that, although they possessed impressive credentials, the defendant's experts were both fallible and mistaken. In support of that theme, the prosecutor advised the jury that the case was a simple one, and that the defendant's true state of mind should best be determined by his deliberate conduct and statements before, during, and after the shootings.

Second, the goals stated above were legitimate, and, based on the evidence, the prosecutor was entitled to argue to the jury, see Appendix [1], [3], [4], that tests done on the defendant should be discounted in favor of the evidence of the defendant's thoughts and conscious actions at the time of the killings. Indeed, the Commonwealth's expert had testified that the proper approach to the issue of criminal responsibility in this case was just that: the existence of a mental defect did not depend on test results, but turned on the defendant's behavior, thoughts, mood, and interaction with others. The prosecutor's comments could perhaps be characterized in some respects as overly rhetorical, but on the whole they were fair and supported by the Commonwealth's evidence.[4]

---

selves losing our temper, because those are not analogous to this situation, ladies and gentlemen.

"Those doctors, based on their years of experience, based on their 40 to 50 hours of testing and based on all of the words that they said, a great many of which I didn't understand and I'm sure some of you didn't, based on all of that, what they told you and what I ask you to find in this, that this man on October 2nd, 1983, suffered from a major — suffered from a mental disease or defect and as a result of that mental disease or defect, did not have the capacity to conform his conduct to the law."

[4]The comments were also supported by evidence tending to show that the defendant's neurological impairment was questionable. Although the defendant had a scar on the right front part of his head, the scar itself apparently did not reveal the nature of the wound that caused it. No medical records were obtained, or apparently sought, to determine the exact nature and degree of the injury. As the injury had been allegedly sustained in childhood, the defendant's recollections were not fresh. Moreover, the defendant, facing murder charges, could not be considered a disinterested source. There was no structural damage to the defendant's brain; the brain wave abnormalities were absent in 1987, though present in 1989; and many of the neurological tests used to assess the defendant's abilities were

See *Commonwealth* v. *Moore,* 408 Mass. 117, 133-134 (1990). It was also reasonable comment for the prosecutor to suggest, see Appendix [2], [3], [4], [7], that the defense experts possessed limited information, derived from tests conducted years after the incident, which did not square with the substantial evidence that the defendant had acted with deliberate premeditation. This argument was based on the evidence described above and also took into account evidence that because brain function is "dynamic," the results of the tests done on the defendant might not disclose his functioning at the time of the crimes when he could well have behaved normally. Over-all, the prosecutor's argument sought to show that the defendant's expert testimony was subject to criticism because it was narrowly grounded, based on the existence of a questionable neurological impairment, lacking in any proof of any psychosis, and quick to concede that, at the time of the shootings, the defendant was fully aware of his conduct and its lawlessness.

Third, the judge gave several instructions that are relevant to the issue of substantial likelihood of a miscarriage of justice. The judge told the jury that "nothing the attorneys say . . . in their closing arguments" is evidence, because the arguments are "exactly that, arguments from the evidence . . . ." This instruction, of course, is common, but the judge repeated its substance three times: before trial, before the start of final arguments, and during final instructions. The judge also gave clear and comprehensive instructions on what constituted the evidence, how credibility should be assessed, and the role of expert witnesses. These instructions emphasized the role of counsel's arguments as compared to the absolute function of the jury in deciding credibility and determining ultimate facts.

Importantly, the judge gave clear and comprehensive instructions on the law of criminal responsibility and on the

---

dependent on his cooperation.

Further, the prosecutor was entitled to exploit the fact that the defendant had deceived his psychiatrist about many of the circumstances of the shooting, a consideration that weakened the expert's opinion.

principles stated in *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), and the Commonwealth's burden of proof with regard thereto. We think these instructions established a detailed framework for the jury to consider, in a reasonable and objective manner, whether the Commonwealth had met its burden of proof on the elements of the crimes charged and on the issues of criminal responsibility and on the principles stated in *Commonwealth* v. *Gould, supra.* .

Fourth, we agree with the defendant that the references to the testimony of the defendant's two doctors as a "dog and pony show," and to one of the doctors as a "little head specialist," and a "wizard," see Appendix [4], were tasteless and improper. These references, however, were so manifestly sarcastic and hyperbolic that the jury likely accepted them as such and discounted them accordingly. See *Commonwealth* v. *Good*, 409 Mass. 612, 626 (1991). See also *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 277 (1982). In light of what has been said thus far, we do not consider them to have been as potentially destructive as the condemnation leveled at the defense psychiatrists in *Commonwealth* v. *Shelley*, 374 Mass. 466, 470 (1978), where it was flagrantly suggested that the defendant had purchased the testimony of his expert witness.[5]

In summary: taken as a whole, and in the context of the actual trial and the jury instructions, we think the jury would have considered the prosecutor's argument as urging them to pay attention to the defendant's conduct before, during, and after the crimes and to reject the theory of the defendant's experts about the defendant's criminal responsibility as narrowly grounded and improbable.

The defendant also argues that the prosecutor misstated and mischaracterized the evidence in several respects. His

---

[5]The comment that psychiatrists were not needed in the case, see Appendix [2], is not in the same category. While somewhat cynical, the argument made the point that the jury should focus on the nonmedical evidence and not allow their function to be usurped by the opinions of the various expert witnesses, including inferentially the Commonwealth's expert.

principal complaints here concern the prosecutor's statement that Dr. Mark did not know the defendant played a guitar,[6] see Appendix [3], and the statements that the doctors had indicated that the defendant could not use his fingers and hands, see Appendix [5], and would have the jury believe that the defendant was someone who could barely walk and talk.[7] See Appendix [6].

The thrust of these parts of the prosecutor's argument was to reemphasize that the jury should consider the opinions of the doctors in light of the considerable evidence that the defendant possessed the physical ability to commit the crimes charged. Although imperfectly executed, the argument was an appropriate one to make. We cannot say that these statements created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Thomas*, 400 Mass. 676, 683 (1987); *Commonwealth* v. *Haas*, 398 Mass. 806, 813 (1986).

2. *Review under G. L. c. 278, § 33E.* The essential facts surrounding the shooting of Doel are as follows. The defendant purchased the murder weapon days before the shooting. On the day of the murders he armed himself and went to Carmen's apartment (after having told Carmen's mother, "I know what I'm going to do"). After the initial confrontation with Carmen and Doel, the defendant restricted Doel's opportunity to flee by disabling Doel's truck. The defendant then confronted Doel three more times before shooting him. To discharge the revolver, the defendant manually cocked the hammer and pulled the trigger for each of four shots. One of the four shots was to Doel's head, and there was evidence suggesting that it was delivered while Doel was lying helpless on the ground. On this evidence, the jury were more than justified in finding the defendant guilty of deliberately premeditated murder.

---

[6]This was a misstatement. The doctor testified that he *did* know that the defendant played the guitar.

[7]These could be considered mischaracterizations. The doctors indicated that the defendant had performed poorly on certain tests involving coordination.

In the circumstances of this case, neither the prosecutor's closing argument, nor the evidence that the defendant may have suffered from certain dysfunctions or personality disorders, nor the facts that the defendant knew the victims well and had no prior criminal record, persuade us that a miscarriage of justice has occurred. We decline to exercise our power to reduce the verdict of murder in the first degree or to order a new trial.

*Judgments affirmed.*

APPENDIX.

[1] "There's no issue that Mr. Cosme shot two people. You don't have to go in there and say, gee, Paula Reddick, is she sure, was Carmen sure, was Angel Santiago? [¹] There's no question about that, is there? The Commonwealth suggests, that while that's an element of the crime, it's not an issue you need to discuss. You don't have to discuss where it happened, what weapon was used, how many bullets were in each person's brain, how he got away in the get away car, how he tried to sell it in Rhode Island. A lot of the evidence is there, undisputed.

"The Commonwealth suggests to you, the only thing, the only thing you should even consider and discuss for any length of time, any critical analysis, the only thing to look at is what Vernon Mark tried to do with his color photographs, but you do it through witnesses, look inside this man's head, not with x-rays and CAT scans and EEG's, no. Look inside. Did he know what he was doing? Do you think he knew what he wanted to do and what he did that day?"

[2] "Defense counsel wants you to focus on a lot of things, the Commonwealth suggests to you, are [un]important. He'd like you to look at death certificates and look at them, they're still dead. He wants you to listen to Larry Bolduc, [²] who testified this morning, but he said, oh, yeah, I did forget my glasses, when I looked out the window. He wants you to focus on tests that are 1987, 1988, look at who these professionals are

---

¹Paula Reddick, Carmen Elizabeth Pineiro (Carmen's daughter), and Angel Santiago were prosecution witnesses.

²Lawrence Bolduc was a defense witness.

and their background, so you won't know what they said, just look at who they are.

"Look. Look. Look. But don't look down like Carmen Pineiro did to the parking lot. Don't look down at her mother with her life going from her and the baby brother in her arms. Don't look at them.

"Did defense counsel want to talk about that? Did he talk about how Julio had to load the gun and pull the trigger back each time he fired? No. He doesn't want to look at that, because that tells you what Julio was thinking that day, doesn't it."

"Dr. Mark and Dr. Lieff, they can tell you that, yes, six years later, I had him do this little test with his hands, fine. That's beautiful.

"Ladies and gentlemen, the evidence in this case, the Commonwealth suggests to you, is overwhelming, that Julio Cosme knew what he was doing that day. You don't need experts. You don't need psychiatrists. If we wanted psychiatrists as jurors, that's all we'd have. You don't need them. You don't need them to understand. Isn't the case simple enough?

[3] "Husband gets thrown out by wife. Husband doesn't like that. Husband gets gun. Husband loads gun. Tells mother-in-law, I know what I'm going to do. He goes back to get the wife. She says, no. He says, okay. You're not coming? See you later. Doel goes, kill me first. Okay, Doel. Four shots. Hey, Carmen, don't run. In the back. Hey, Carmen, you're still alive. In the forehead. And I'm getting out of here.

"Not very complicated. No one has to go through x-ray and CAT scans to figure out why someone would kill.

"If you're going to listen to Dr. Mark and Dr. Lieff and say, he's not responsible for that. I mean, the poor guy, he fell off a horse when he was ten. Come on, the poor guy.

"What did Dr. Mark tell you? He tells you that, well, the first test I did, and they were done on, let's see, four years after the murder. Four years after the murder, I looked at his brain, did EEG's and CAT scans, and they were normal. But there's a new sophisticated test. I have all these pictures I've pulled out. There's colors and lines and graphs and I saw some abnormality in the frontal lobe. So what? I said, doctor, did he have that back in '83? I don't know. How did he get the injury? I don't know. He doesn't know. What Dr. Mark said was very significant to him, I had him do a test where he had to open one hand and close the other hand and he couldn't do it.

"I said, doctor, do you know he plays the guitar? Well, I didn't. Think he could load a gun? Think he could shoot a gun? Yes. Think he could drive a car? Yes."

[4] "And then, he brings in Dr. Lieff. Like a little dog and pony show. First the x-rays and then his little head specialist that comes in after, with all these doctors. And what did Dr. Lieff tell you? In my opinion, he couldn't control himself. Thank you, doctor. Do you care about what he did that day? Is that significant, I asked him. Is it significant how Julio

Cosme acted just before he killed his wife and brother and just after? You know what he said, not particularly.

"This man's a wizard. Dr. Lieff can look in his mind all by himself. He doesn't need to hear what he did. He doesn't need to talk to his friends. But he tells you, he can look in this man's mind as a psychiatrist, tell you, tell you, listen to me, folks, you don't understand. 1989, I can tell you what he was thinking in 1983.

"And what was his big significant point, the basis of his opinion? The most significant thing to him, the most significant thing to Dr. Lieff, remember what it was, the old distraction test. Remember what he said? He said, I had Mr. Cosme read numbers and letters and there's pictures of blood that were put in front of him and guns. And geez, it took him a long time to finish reading those numbers and letters. He said that is a significant basis of his opinion, that he couldn't control himself six years before.

"Did that impress you? Is there a lot of common sense to that?"

[5] "Remember what Trooper Caulfield told you about the gun? The first latch, you can't shoot it. The second, no. It's got to be all the way back. You've got to load it manually. I don't know. These doctors say he can't use his fingers and his hands. Look at this gun. He did a pretty good job loading it, didn't he? Twenty-two caliber. He was in such a rage that day.

"Dr. Lieff tells you, oh, it was terrible. He was in such a state, he was vomiting, he couldn't eat. What did Julio do before he killed them? He had a nice meal at the mother-in-law's and killed them after. I know what I have to do. Loaded the gun. Knew what he wanted to do every time he fired, do it again. Doel, two. Doel's still under the car trying to fix it. Three. It was the last to go, four."

[6] "Remember what [Carmen's daughter] told you? She went over to pick her baby brother up and here's Julio, poor estranged husband, goes over to Carmen. Remember what Dr. Hori said? Close contact wounds? Hey, Carmen.

"Doesn't that tell you everything you have to know? What does he do after he shoots them? Is he in some wild rage? Does he fall on the ground? Does he sit and cry? Does he? Does he fall on top his wife and go, Carmen, I love you, but I had to do it?

"No. Out of there, in his car. And what's he think about? This man, who, if you listen to the psychiatrists, he'd be lucky if he could walk and talk. What does he do? Pulls around the corner, gets out, takes the gun, over the fence; gets the ammunition, over the fence. You think he knew what he was doing? Of course, he did. And what does he do? He goes to Waltham, to his friend Angel Santiago and tells Angel, I just shot her. He even remembered the wife may not be dead yet. But what did he tell Angel? Not only did he tell Angel that he shot them both, Angel said, why did you do it? Why did you do it? And remember what Angel told you? He didn't answer."

[7] "They can march all the doctors in the world they want up there, ladies and gentlemen; it doesn't change what he did. They can get there six years later and give you their opinions. I still don't know — I couldn't understand exactly what this brain injury they're talking about is, I don't think he could either, when I asked him. But if they do all these little shows with their hands, that tells him, that you should listen to him. You people don't know enough, listen to these experts; that's what he's telling you. Mr. Courtney says, they're so qualified. At what?

"They got common sense? Did they hear from the witnesses, like you did? No. You heard from them. You know more about this case than them. You know more about this case than anyone. You've heard eye witnesses of this murder. You've heard this case and you've heard what this man did and you heard the way he acted. He knew what he was doing. He wanted to kill them. He wanted to kill them. He did. Shot them in the back. Did he have a reason? Did he have a motive? You don't need one but I think he has one. Didn't like getting thrown out of the house. Thought his brother was fooling around because his brother was taking the wife, so he took care of them both."