COMMONWEALTH *vs.* JOHN MCINTYRE.

Essex. October 6, 1999. - December 31, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Practice, Criminal,* Preservation of evidence, Argument by prosecutor, Instructions to jury, Reasonable doubt, Presumptions and burden of proof. *Evidence,* Relevancy and materiality, State of mind, Hearsay. *Words,* "Moral certainty."

At the trial of a murder indictment, the defendant did not demonstrate on a motion to dismiss the indictment based on the destruction of his motor vehicle, which was the scene of the alleged crime, that there was any reasonable possibility that destruction of the car deprived him of evidence that would have been favorable to his case. [536-538]

At the trial of a murder indictment, there was no error in the judge's permitting the testimony of an emergency room nurse as to her observation of the victim's mental state at the time the victim made a statement [538], or permitting three witnesses to testify about a statement made by the defendant concerning a dream in which he killed the victim, where the statement was probative of the defendant's state of mind, motive, and intent [538-539].

At the trial of a murder indictment, testimony of two witnesses about their state of mind regarding the defendant's presence with the victim in a certain apartment before the murder should not have been admitted in evidence, where their feelings had no relevance to any contested issue and served only to implicate the witnesses' fear of the defendant and the defendant's bad character; however, in the context of the entire trial, the jury could not have been influenced by the erroneously admitted evidence. [539-541]

At a murder trial, error, if any, in the admission of certain evidence was harmless, where it was merely cumulative of other properly admitted evidence. [541]

At the trial of a murder indictment, no reversible error was created by certain comments in the prosecutor's closing argument [541-542]; and errors in the prosecutor's arguing an invented fact or using impeachment evidence substantively did not create a substantial likelihood of a miscarriage of justice, in light of the evidence at trial and the judge's instructions to the jury [542-543].

At a murder trial, there was no error in the judge's instructions to the jury on circumstantial evidence. [543-544]

INDICTMENT found and returned in the Superior Court Department on February 8, 1995.

A motion to dismiss was heard by *Robert A. Barton*, J., and the case was tried before him.

*Robert L. Sheketoff* for the defendant.

*Gregory I. Massing*, Assistant District Attorney (*Fred B. Mc-Alary, Jr.*, Assistant District Attorney, with him) for the Commonwealth.

IRELAND, J. John McIntyre was found guilty of murder in the first degree by reason of deliberate premeditation. Represented by new counsel, he appeals from his conviction, arguing that (1) his motion to dismiss the indictment based on the destruction of evidence should have been granted; (2) evidence was improperly admitted at his trial; (3) the prosecutor made improper remarks during closing argument; and (4) the jury charge on circumstantial evidence improperly included the phrase "moral certainty." The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We find no basis to grant a new trial, nor any reason to grant relief under § 33E, and we affirm the conviction.

We summarize the evidence in the light most favorable to the Commonwealth. See, e.g., *Commonwealth* v. *Gilbert*, 423 Mass. 863, 864 (1996).

Because the facts are complicated, we recite them in some detail. The defendant and the victim had an on-and-off stormy relationship that lasted for approximately three years, but by the fall or winter of 1994, they had stopped seeing each other.

Early in the evening of January 10, 1995, Brian Perry went to visit his friend, Sean McCarthy, at his apartment on Phillips Street in Lawrence. McCarthy was not home at that time, but one of his roommates, Dan Enaire, was home. Chad Enaire, Dan's brother, arrived with the defendant at the same time Perry was arriving, and the three walked up the stairs together. The defendant told them about a dream he said he had had the night before. The defendant said he had dreamed that the victim was "bitching" and he killed her by punching her down some stairs, and that Chad and Dan were with him in the dream. Perry then left. As he did so, the defendant said to him that he had tried to find Perry's apartment earlier, and that "they were going to come by because there were people there that they wanted to shut up." Perry then went home to his apartment on Auburn Street in Methuen. The defendant and the Enaire brothers arrived shortly afterward. Prior to that occasion, the defendant had never been to that apartment. Perry sat down in

the kitchen with the three and began to play cards, drink beer, and smoke marijuana.

At approximately the same time, the victim and her friend, Michael Moison, drove over to Brendan Beveridge's house. Beveridge had known the victim for about six years, and in the months preceding her death, the two of them, along with Moison, had spent time together nearly every day, either at Beveridge's house or at the apartment of another friend, Wes Gilbert. Gilbert was a roommate of Perry. At approximately 8:30 P.M., Laurie Tudisco arrived at Beveridge's house and she, the victim, Moison, and Beveridge drove to Gilbert's apartment. They entered the second-floor apartment through the front door and sat down in the living room with Gilbert. At this time, the defendant, Chad Enaire, Dan Enaire, and Perry were still in the kitchen drinking beer and playing cards.

Shortly after the victim and her friends arrived, the defendant came into the living room, stood directly in front of where the victim was seated on a couch, and began yelling at her. The defendant called the victim names and accused her of having sex with other men. The victim in turn called the defendant names and told him to leave. The defendant spit in the victim's hair. The defendant then left the living room, but as he was leaving he said to her, "No one's going to help you here . . . ." After this encounter, the victim was upset. Beveridge asked Tudisco for a ride home, and she, with the victim and Gilbert, gave him a ride home. After dropping Beveridge at his house, the victim, Tudisco, and Gilbert stopped at a liquor store before returning to the Auburn Street apartment. The three arrived back at approximately 9:30 P.M., sat down in the living room, and were rejoined by Moison. Shortly after the victim started to mix herself a drink, the defendant entered the living room a second time. The defendant and the victim again exchanged shouted insults. The defendant grabbed the bottle of rum with which the victim had been making her drink and he poured much of the contents over her. Gilbert attempted to intervene at this point. The defendant looked menacingly at Gilbert while making a fist, and then walked out of the living room. As he was leaving the room, the defendant turned around and said to the victim, "You're dead. And your family, too." At this point, the victim was scared and crying.

Shortly thereafter, the defendant reentered the living room a third time. He grabbed the victim's glass and poured the

contents over her while he and the victim exchanged shouted insults. As the defendant began to hit the victim on her head, the victim curled into a ball on the couch. The defendant then threw the victim over the arm of the couch, hitting her head on the front door. The defendant stood over the victim, pulled her up, and spit in her face. At this point, the victim asked Tudisco for a ride home. The defendant looked at Tudisco and said, "Who the fuck is going to try to take her home." Tudisco was scared and crying at this point, and she left the living room and went into one of the bedrooms. The defendant left the living room and when he entered the kitchen he stated, "I just killed her. She just fucked up. I dreamed about it last night." At this point, which was close to 10 P.M., the victim grabbed her purse and went out the front door of the apartment. A few seconds later the defendant followed. A neighbor, Rosalie Hagopian, who lived in the house next door to Perry and Gilbert's apartment, testified that at almost precisely 10 P.M., she heard a noise outside, and when she looked out her window, she saw a girl running down the street and a boy chasing her. The boy caught up to the girl after they had run the length of two houses, grabbed her shoulder, and swung her around. He then put both hands on her shoulders and put his face right up to hers. The neighbor could not see whether the boy was kissing the girl or saying something to her. The boy then took the girl's hand and the two walked back down the street and got into a parked car. The two remained there a few seconds and then drove off.

At approximately 10:10 P.M., the defendant carried the victim into the emergency room at Holy Family Hospital in Methuen. The victim, who had been stabbed under her collarbone on the left side of her body, was bleeding heavily, was semiconscious, and was unresponsive to questions concerning her name or other information. A triage nurse, Susan Sadowski, learned the victim's name from the defendant, and when she asked the defendant what had happened to the victim, he responded to the effect that there had been a drug deal in Lawrence that "went bad," and the victim had been stabbed. Sadowski wheeled the victim to an examination room, where other medical personnel began attending to her, and returned to ask the defendant further questions about the victim's family and medical information. She also requested the emergency room secretary to notify the Lawrence police about the stabbing.

Officer William Beck, a uniformed patrolman for the city of

Lawrence, arrived at the hospital around 10:15 P.M. and met the defendant in an area near the emergency room. Officer Beck observed that the defendant had blood on his hands and clothing and that he appeared nervous. When questioned by Officer Beck as to what had happened, the defendant replied that he had gone to Lawrence to buy some marijuana, gotten out of his car and approached some "Spanish people" who were standing in a vacant lot across the street, argued with them about price, and then ran back to his car with the people following him. When he got into his car, he reached over to his girl friend, felt "a wetness," and when he looked at his hand, his hand was red. When questioned by Officer Beck as to where in Lawrence this had occurred, the defendant could identify the area only as a side street off Broadway near Al Martin's, a local retailer. Officer Beck then requested that members of the detective squad come to the hospital.

Detective Sergeant Alfred Petralia and Detective Brian Burokas arrived at the hospital at approximately 10:30 P.M. and noted that the defendant had blood on his hands and clothing and that he appeared very nervous. The defendant was read the Miranda warnings and then questioned by the detectives. The defendant stated that he had been looking to buy some marijuana, had taken a right off Broadway near Al Martin's, parked his car on a side street, and left the victim in the passenger seat while he approached two Hispanic males. The defendant further stated that the two males grabbed his money, chased him back to his car, and when he got in the car, he noticed that the victim had been stabbed. On further questioning by the detectives, the defendant was not able to give a description of any landmarks or buildings, nor was he able to describe the Hispanic males' height, weight, facial hair, or any other features.

The detectives then attempted to speak with the victim. Detective Burokas was given permission by the attending physician to ask one question, and he asked the victim whether her boy friend had stabbed her. The victim did not respond. One of the nurses in the room, Jeanne Botelho, then repeated the question, and the victim responded, "No." Various medical personnel testified that, at the time she was asked the question, the victim was in shock, her medical condition was desperate, and she was in and out of consciousness. The victim died in the operating room shortly thereafter. The cause of her death was loss of blood.

After Detective Burokas spoke with the victim, he, Detective Sergeant Petralia, and Officer Beck went out to the parking lot to examine the defendant's car. While shining their flashlights into the passenger side of the car, the officers observed blood as well as a woman's purse on the floor. On the floor of the driver's side, the officers observed an empty black knife sheath. The detectives then went back into the hospital to speak with the defendant again. The detectives obtained the defendant's permission to tow the vehicle, and then asked the defendant about the knife sheath. The detectives observed that the defendant became very nervous, avoided eye contact, and then stated that he did not know anything about a knife sheath. Next, the detectives oversaw the towing of the defendant's vehicle, and, after a brief stop at their office, went to the facility where the car had been towed in order to collect evidence.

Meanwhile, the defendant had offered to show the police where in Lawrence the alleged drug deal had taken place, and Officer Beck was assigned the task. Starting from Al Martin's, the defendant eventually directed Officer Beck to the area in front of 16 Walnut Street. The defendant pointed out the vacant lot where he said he had approached the Hispanic males. When Officer Beck asked the defendant which route he had driven to Holy Family Hospital, the defendant could not identify the route. Previously, the defendant stated to Officer Beck that he had driven directly to the hospital after the stabbing and that he had gone to Holy Family Hospital because he knew the way there. Officer Beck then drove the defendant back to the hospital. During their subsequent investigation, police officers timed the route from Auburn Street to Walnut Street to Holy Family Hospital and obeying all traffic laws, but not stopping otherwise, the drive took a total of eleven minutes and nineteen seconds. The hospital is actually located just a few blocks from the Auburn Street area.

Back at the hospital, the defendant telephoned his sister, Kim McIntyre, for a ride, and she picked him up at approximately midnight. Just before they reached the exit of the hospital, the defendant asked his sister to stop, and he got out of the truck. Kim McIntyre could see the headlights of two cars behind her when she was stopped. In each of those two cars were nurses who were leaving the hospital at the end of their shifts, and who had assisted in the victim's care. Both nurses watched the truck come to an abrupt halt. The nurse in the car closest to the

truck watched the defendant jump out of the truck and walk over toward the side of the road. The nurse observed the defendant look at the ground as he walked around, then pick something up off the ground, put it under his arm, and run back to the truck.

At the defendant's request, Kim McIntyre drove him to Phillips Street in Lawrence, where the defendant's friend, Scott Hatch, was staying with his girl friend, Jill Monroe. Monroe shared that apartment with Dan Enaire and McCarthy. The defendant and his sister arrived at the Phillips Street apartment at approximately 1:20 A.M., and were let into the apartment by Hatch. Monroe noticed that the defendant had blood on his clothing and asked him what had happened. The defendant responded that he had stabbed the victim, but that he had brought her to a hospital and she was awake and responding. The defendant also told Monroe that he had told the police it was a drug deal gone bad. Monroe then saw the defendant go into the bathroom for a brief time, and when he came out, he was wiping a knife with a tissue. The defendant put the knife into a pocket and went into Monroe's bedroom, joining Hatch there. At some point during the twenty minutes that the defendant and his sister were at the Phillips Street apartment, Hatch asked Monroe if the defendant could stay at the apartment, to which she said no. When the defendant and his sister were preparing to leave the apartment, the sister noticed the defendant had a long knife and she told him that if he was coming with her, he could not bring the knife. They then left and she dropped him off in Lawrence near a pharmacy.

At approximately 6:30 A.M., police officers went to the Phillips Street apartment searching for the defendant. The officers asked Monroe if she had seen the defendant that evening and, because she was scared, she said no. While the police were shining their flashlights around the apartment, they saw a "reflection" on top of the refrigerator, which, on closer examination, was a knife. Monroe, Hatch, and Sean McCarthy all denied ownership or knowledge of the knife. Dan Enaire later denied ownership of the knife also. The police officers then put the knife back on top of the refrigerator and left the apartment. The defendant was arrested a few hours later.

Around 9 A.M. that morning, Monroe left the apartment to do some errands. She put the knife in her purse and took it with her. At trial, she testified that she took the knife with her because

she was nervous and did not want it in her home. While she was out, Monroe stopped at a convenience store. On her way out, she threw the knife into a trash barrel just outside the store. Sometime later in the evening, Monroe returned to the convenience store and took the entire trash bag from the barrel where she had thrown away the knife. She then took the bag to a friend's house, retrieved the knife from the bag, and eventually went to the North Andover police station to turn in the knife.

Other evidence introduced at trial established that the knife was consistent with the victim's injury and with a hole in the victim's sweater, and that the knife fit into the sheath retrieved from the defendant's car. Although there were no visible blood stains on the knife, the "top groove" of the knife did test positive for blood. The knife was never tested for fingerprints. In addition to the knife, the bathroom sink and faucet and the top of the refrigerator at the Phillips Street apartment tested positive for the presence of blood. There was further evidence that two fibers found in the groove of the knife and fibers taken from the victim's sweater were the same color and had the same microscopic appearance.

1. *Motion to Dismiss Based on Destruction of Evidence.*

The motion judge made the following findings of fact relative to the destruction of the defendant's automobile. The defendant was arraigned in the Lawrence Division of the District Court Department on January 11, 1995, at which time an attorney was appointed to represent him. The same attorney represented the defendant throughout his trial. At the arraignment, the attorney was made aware that the defendant's car was possibly the crime scene.

On January 16, 1995, notification was sent to the McIntyre family that the vehicle was at a certain garage in North Andover, and, on February 17, the family was notified that the vehicle could be released to them.[1] Between March and June, 1995, there were a number of calls between Kim McIntyre and employees of the garage about picking up the car, but by June, 1995, the McIntyre family indicated that they did not want the car. In September, 1995, the car went to salvage and was destroyed. Defense counsel was not notified about the pending

---

[1]The judge's findings do not indicate who notified the McIntyre family that the car could be released, nor did the judge indicate how that notice was effected. It appears that the family was contacted by the towing company.

destruction. On October 6, 1995, defense counsel filed a motion seeking access to the automobile. In a written decision denying the defendant's subsequent motion to dismiss the indictment based on the destruction of the vehicle, the motion judge balanced the culpability of the Commonwealth, the potential exculpatory evidence lost, and the prejudice to the defendant. We agree that the defendant was not entitled to a dismissal of the indictment, but for different reasons.

To obtain a dismissal of an indictment based on the destruction of evidence, a defendant "has the initial burden of establishing a reasonable possibility, based on concrete evidence and not on mere speculation, that the Commonwealth's actions deprived him of evidence that would have been favorable to his case." *Commonwealth* v. *Olszewski*, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994). Once the defendant meets this burden, a judge must then balance the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant in order to determine the appropriate remedy, which, although rare, may include dismissal of an indictment. See *id.* at 716-717; *Commonwealth* v. *Henderson*, 411 Mass. 309, 310 (1991).

In his motion to dismiss the indictment, the defendant claimed three possibilities for exculpatory evidence from the automobile: (1) there could have been an object in the car consistent with the bloody wipe stains found on a towel in the car; (2) testing for blood on the driver's side could have shown that the defendant did not have blood on his hands; and (3) fingerprint testing of the entire car and its contents could have developed the prints of an intruder. We conclude that these possibilities do not rise to the level of a "reasonable possibility" of favorable evidence.

As to the first contention, even if another object was found in the car, it is unclear how this would have helped the defendant. As to the second, it is extremely unlikely that such testing would have revealed the absence of blood on the driver's side.[2] Even if it had, this would not necessarily support a conclusion that the defendant did not stab the victim. As to the third conten-

---

[2] The evidence at trial revealed that the defendant, after carrying the victim into the emergency room and before the police arrived, moved his car from in front of the emergency room to a parking area. Several witnesses testified that the defendant had blood on his hands and clothes after he carried the victim into the hospital. Furthermore, in at least one of the statements given by the

tion, the car was tested extensively for fingerprints by the police, particularly on the passenger side of the vehicle, and several unknown prints were discovered. The possibility that additional fingerprinting of objects in the car would have revealed any evidence helpful to the defendant, beyond that which was actually discovered on the exterior of the car, is remote and speculative. The defendant, therefore, has not met his initial burden, and there is no need to balance the aforementioned factors.

2. *Evidentiary Rulings.*

The defendant claims four erroneous evidentiary rulings. First, the defendant claims the judge erred by permitting Jeanne Botelho, the emergency room nurse who repeated Detective Burokas's question to the victim, to testify over objection as to her opinion of the victim's level of consciousness.[3] The defendant argues that this testimony was an impermissible expert opinion on the credibility of the victim. While it is true that an expert "may not offer an opinion on a witness' credibility," *Commonwealth* v. *Ianello,* 401 Mass. 197, 202 (1987), Botelho's testimony was not offered for that purpose. Rather, Botelho provided her own observations as to the victim's mental state at the time the victim answered the question, and there was, therefore, no error. See *Commonwealth* v. *Pina, ante* 66, 75 (1999) ("credibility of the declarant of a hearsay statement [admitted into evidence] may be impeached by any evidence that would have been admissible if the declarant had testified"); *Commonwealth* v. *Russell,* 38 Mass. App. Ct. 199, 202 (1995), quoting P.J. Liacos, Massachusetts Evidence § 7.5, at 370 (6th ed. 1994) ("Witnesses may . . . describe the emotional, mental, or physical condition of another in terms of summary description").

Second, the defendant claims the judge erred by permitting three witnesses, Chad Enaire, Dan Enaire, and Brian Perry, to testify, over objection,[4] concerning the conversation the defendant had with them about his dream of killing the victim. The defendant contends that this evidence was irrelevant and

---

defendant to the police the defendant stated that he had reached over and felt "a wetness" on the victim.

[3]Specifically, Botelho testified: "I think [the victim's level of consciousness] was minimal in the least. My impression is she really didn't know what I was saying."

[4]The defendant objected when Brian Perry and Dan Enaire were questioned, but did not object when Chad Enaire was questioned.

inflammatory. The Commonwealth argues that it was probative of intent. At trial, the judge ruled that the probative value of the evidence outweighed any danger of unfair prejudice, and we conclude the ruling did not constitute palpable error. See *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982) (judge's determination as to probative value and unfair prejudice will be upheld absent palpable error).

We have decided a few cases that involved dream testimony, but we have never been presented with the question posed by the particular facts in this case. See *Commonwealth* v. *Maltais*, 387 Mass. 79, 85-89 (1982) (defendant's statements to police concerning dream he had about murder after murder took place were voluntary and admissible); *Commonwealth* v. *Robinson*, 146 Mass. 571, 583 (1888) (evidence that defendant said she "had had a terrible dream, and, whenever she had a dream like that, one of the family always died," admissible to show scheme or plan). See also *Commonwealth* v. *Davis*, 38 Mass. App. Ct. 932, 933-934 (1995) (defendant's statement to witness that he dreamed he pushed her into river had only "marginal relevance" to defendant's state of mind or motive, but no substantial risk of miscarriage of justice). In many circumstances, any relationship between testimony about a dream and a subsequent act may be speculative and therefore unreliable. See *State* v. *Tyler*, 251 Kan. 616, 629-632 (1992) (in prosecution of murder of law enforcement officer during drug raid, it was abuse of discretion to admit evidence of defendant's dream, in which a detective almost captured defendant, and defendant's subsequent statement that if a particular detective came to get him, the defendant would "take someone out," to prove state of mind; "[s]uch [dream] evidence is too speculative to be reliable," and the evidence of the subsequent statement was too closely related to dream to be probative). We conclude, in the circumstances of this case, the defendant's recounting of a dream during which he stated he killed the victim, just hours before the victim was stabbed in his car, could serve to explicate the defendant's later comment, "I just killed her. She just fucked up. I dreamed about it last night." Furthermore, any potential prejudice to the defendant was limited by the judge's sua sponte instruction, given immediately followng the third witness's testimony, limiting the evidence to the issue of motive and intent.

Third, the defendant claims the judge erred by permitting Gilbert and Beveridge to testify, over objection, about their own

feelings regarding the defendant's presence at the Auburn Street apartment. The defendant claims that the evidence was irrelevant and had an impermissible implication, that is, the witnesses believed the defendant was of bad character. The Commonwealth contends that the evidence was relevant to rebut the defendant's argument that the witnesses had not intervened between the defendant and the victim because their fighting was not serious.

A witness's state of mind is not admissible unless it is relevant. In the circumstances of this case, a properly elicited answer to, "Why didn't you intervene in the fight?," would have been relevant to rebut the defendant's contention that the witness did not intervene because the fight was not serious.[5] That is not, however, what happened in this case. On direct examination, Beveridge was asked what his state of mind was while he was riding to the party at the Auburn Street apartment. His answer is set out in the margin.[6] The witness's state of mind on his way to the party had no relevance to any contested issue, and served only to implicate the witness's fear of the defendant, and consequently, the defendant's bad character. The evidence should not have been admitted. See, e.g., *Commonwealth* v. *Roberts*, 378 Mass. 116, 129 (1979). Similarly, the testimony elicited from Gilbert, which is set out in the margin,[7] had no relevance to any contested issue, served only

---

[5]Of course, a trial judge would still be required to balance the relevancy against the possibility of unfair prejudice.

[6]Specifically, Beveridge testified as follows:

*Q.*: "What was your state of mind concerning going over to Auburn Street that evening?"

*A.*: "I felt there would be trouble there and I didn't think [the victim] should go over there."

*Q.*: "Why did you think there would be trouble?"

*A.*: "I thought there might be trouble because [the defendant] was over there and he had never been there before."

[7]Gilbert testified as follows:

*Q.*: "Did you join this group in the kitchen at any time?"

*A.*: "No, sir."

*Q.*: "Why was that?"

*A.*: "I didn't want to go into the kitchen because I knew there was bad vibes in there. I knew there was a reason why he came over."

*Q.*: "What was your state of mind at the time?"

*A.*: "Watch my back."

the same improper purpose as Beveridge's state of mind testimony, and should have been excluded.

Having concluded that the evidence should not have been admitted, we must ask whether "the error[s] possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Qualls,* 425 Mass. 163, 170 (1997), quoting *Commonwealth* v. *Schulze,* 389 Mass. 735, 741 (1983). The improperly admitted evidence was minimal in the context of the entire trial and the Commonwealth did not attempt to highlight it. There was substantial, properly admitted, evidence to show the defendant's malicious intent, his hostility toward the victim, and his intimidation of her friends. We conclude, therefore, that "the jury could not have been influenced by the [erroneously admitted evidence]." *Commonwealth* v. *Qualls, supra,* quoting *Commonwealth* v. *Stone,* 321 Mass. 471, 474 (1947).

Fourth, the defendant claims that the judge erred by permitting Perry to testify, over objection, that very shortly after the defendant left the Auburn Street apartment, Perry telephoned the operator for the time and had the clock on his microwave set to 9:58 P.M. The defendant argues that this was a "classic example" of hearsay that should have been excluded. We assume without deciding the issue of admissibility, and conclude, in any event, that Perry's testimony on this issue was merely cumulative of other witnesses' testimony as to the timing of the victim and the defendant's departure from the Auburn Street apartment. See, e.g., *Commonwealth* v. *Perrot,* 407 Mass. 539, 549 (1990).

3. *The Prosecutor's Closing Argument.*

The defendant contends that he was denied a fair trial because the prosecutor, in the closing argument, referred to the "O.J. trial,"[8] referred to the defendant's failure to testify, mischaracterized Rosalie Hagopian's testimony, invented the fact that the victim, as she was leaving the Auburn Street apartment for the last time, stated that she was going to see her new boy friend, and twice substantively used evidence which had been admitted only for impeachment purposes.[9] At trial, defense counsel objected to the references to the defendant's silence and the "O.J. trial," but did not object to the other alleged errors.

[8]The reference is to People *vs.* Simpson, Los Angeles County Superior Court, No. BA097211 (1995).

[9]At trial, Kim McIntyre testified that the defendant called her from the hospital and said that he "had had some trouble." She denied that he said he

We dispose of the first three claims briefly by concluding that the prosecutor's passing reference to the "O.J. trial" could not have affected the jury's rational consideration of the evidence[10]; that the prosecutor's comment did not focus the jury's attention on the defendant's right not to testify, and in any event, the judge gave strong instructions on the defendant's right to remain silent[11]; and that the prosecutor did not mischaracterize Rosalie Hagopian's testimony.[12] As for the other errors, the Commonwealth concedes them, but argues that they do not create a substantial likelihood of a miscarriage of justice.

It is, of course, required that prosecutors and defense counsel limit comment in closing arguments "to the evidence and fair inferences that can be drawn from the evidence." *Commonwealth* v. *Kelly*, 417 Mass. 266, 270 (1994). The prosecutor's invention of a fact, as well as the two substantive uses of evidence admitted only to impeach, were clear error. Because these errors were not objected to, we review them to determine whether they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Torres*, 420 Mass. 479, 484 (1995); *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991); *Commonwealth* v. *Lennon*, 399 Mass. 443, 446 (1987) (on direct appeal of conviction of murder in first degree, court will consider unobjected to errors only pursuant to duties under G. L. c. 278, § 33E). When making this determination, we

---

was in trouble. A police officer's testimony to the contrary was admitted for impeachment purposes. In his closing argument, the prosecutor stated that the defendant called his sister and said, "I am in big trouble."

Also at trial, Scott Hatch could not recall that the defendant, while at the Phillips Street apartment in the early morning hours of January 11, had confessed to the stabbing. Hatch's prior sworn statement to the contrary, given to a police officer, was admitted for impeachment purposes. In closing argument, the prosecutor argued that Hatch's signed statement corroborated Jill Monroe's testimony that the defendant said he had stabbed the victim.

[10]In response to defense counsel's argument that the police investigation had been incompetent, the prosecutor argued that the police had thoroughly investigated and that "[t]his [trial] is not a mini O.J. trial where the police are incompetent."

[11]The prosecutor stated, when discussing the interaction between the victim and the defendant outside of the Auburn Street apartment, "We will never know what was said [between the victim and the defendant] on that street."

[12]The prosecutor argued: "[Defense counsel asked,] 'Didn't you see him kiss her?' To which she responded, 'No. They were close. I saw him get into her face.' " The witness's testimony was: "I wasn't sure if he was kissing her or if he was saying something to her. His face was right to her face. . . . It could have been a kiss . . . ."

consider "the remarks in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial." *Commonwealth* v. *Cosme, supra.* Cf. *Commonwealth* v. *Santiago,* 425 Mass. 491, 499-500 (1997), *S.C.,* 427 Mass. 298, and 428 Mass. 39, cert. denied, 425 U.S. 1003 (1998) (stating standard of review for objected to statements in noncapital case).

In this case, the invented statement could have been used by the jury to establish motive, and the prosecutor's substantive use of the inconsistent statements could have unfairly strengthened the Commonwealth's case. On the other hand, there was substantial actual evidence of the defendant's ill will toward the victim, as well as evidence that the victim had been dating other men and the defendant knew it. Additionally, there was overwhelming evidence that implicated the defendant in this murder. Further, at the time the inconsistent statements by Kim McIntyre and Scott Hatch were admitted, the judge gave instructions to the jury concerning the proper use of such statements, and also gave an additional instruction about inconsistent statements during the jury charge. During the final jury charge, the judge also instructed that closing arguments were not evidence, and that if the jurors' memory of the evidence differed from what they heard in arguments, the jurors' memory should prevail. In light of the above factors, and considering the errors in the context of the entire closing argument and the case as a whole, we conclude that the above errors did not create a substantial likelihood of a miscarriage of justice. We do note, however, that these types of errors are inexcusable, and prosecutors are once again sternly cautioned to keep closing arguments within proper bounds.

4. *Jury Charge on Circumstantial Evidence.*

Finally, the defendant contends that the judge's charge on circumstantial evidence, which included the phrase "reasonable and moral certainty," impermissibly lowered the Commonwealth's burden of proof.[13] The defendant did not object at

---

[13]The portion of the charge now objected to provides:

"For the Commonwealth to prove its case based solely on circumstantial evidence, the circumstances must be such as to produce a moral certainty of guilt and to exclude any other reasonable theory. The circumstances taken together should be of a conclusive nature and tendency leading on the whole to a satisfactory conclusion and produc-

trial, and in fact, the charge was his requested version. The judge properly instructed on reasonable doubt by stating that the jury could not convict until they felt "an abiding conviction to a moral certainty of the truth of the charge. You [the jury] may not convict the defendant unless and until you have reached a subjective state of near certitude that the defendant is guilty." The subsequent instruction on circumstantial evidence did not dilute the Commonwealth's burden of proof, and there was no error. See *Commonwealth* v. *Painten*, 429 Mass. 536, 545 (1999); *Commonwealth* v. *Therrien*, 428 Mass. 607, 610-612 (1998). See also *Victor* v. *Nebraska*, 511 U.S. 1 (1994).[14]

5. *Section 33E Review.*

Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record. We find nothing that compels us to exercise our discretion to disturb the jury's verdict, either by reducing the verdict or granting a new trial.

*Judgment affirmed.*

---

ing a reasonable and moral certainty that the offense charged in fact occurred and that this defendant, and no one else, committed the offense charged."

[14]We make one additional observation here. The defendant requested that the judge give a *Bowden*-type instruction based on the absence of certain fingerprinting and fiber analysis. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). The judge declined to give such an instruction, but stated that defense counsel would be able to argue it to the jury. We have never held "that a judge *must* give instructions on the claimed inadequacies of a police investigation." *Commonwealth* v. *Daye*, 411 Mass. 719, 741 (1992).