## Commonwealth *vs.* Callum A. Miller.

Essex. February 12, 2010. - June 10, 2010.

Present: Marshall, C.J., Spina, Cowin, Botsford, & Gants, JJ.

*Homicide. Malice. Practice, Criminal,* Capital case, Instructions to jury, Argument by prosecutor, Lesser included offense. *Assault and Battery.*

At a murder trial where the critical issue was whether the defendant's mental impairment and alcohol consumption together vitiated the necessary intent to constitute malice, the judge's instruction to the jury that it was permissible to infer malice from the intentional use of a dangerous weapon did not create a substantial likelihood of a miscarriage of justice, where, in the circumstances, there was no realistic risk that the jury would ignore the judge's strong and detailed instruction on malice and fail to appreciate that the defendant's mental impairment and use of alcohol were factors to consider in relation to whether the Commonwealth had proved malice, and where the instructions did not preclude the jurors from considering whether the defendant's mental impairment and alcohol consumption affected his capacity to intend the use of a dangerous weapon. [72-76]

At a murder trial, the prosecutor's error in arguing facts not in evidence (i.e., details regarding three past sexual assault prosecutions where the defendant was the victim) did not create a substantial likelihood of a miscarriage of justice requiring reversal, where the judge correctly instructed the jury about their use of the evidence; where the defendant had stipulated that he had been the victim in those past prosecutions and sought admission of evidence regarding them; where there was a reasonable basis in the record for the facts argued by the prosecutor; and where defense counsel did not object to the prosecutor's argument when it was made. [76-79]

There was no merit to a criminal defendant's argument that the prosecutor, in closing argument, improperly urged the jurors to ignore the testimony of the defendant's expert [79] or improperly implied that it was the jury's duty to convict [79-80].

At a murder trial, the judge's failure to instruct on the lesser included offense of assault and battery did not create a substantial likelihood of a miscarriage of justice, where such an instruction was neither requested by any side nor warranted by the evidence. [80-81]

Indictment found and returned in the Superior Court Department on October 24, 2001.

The case was tried before *David A. Lowy,* J.

*Alan D. Campbell* for the defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. A jury convicted the defendant, Callum A. Miller, of murder in the first degree by reason of extreme atrocity or cruelty.[1] On appeal, the defendant argues that (1) the trial judge erred in giving an instruction that it was permissible for the jury to infer malice from the intentional use of a dangerous weapon; (2) the prosecutor's closing argument contained several improprieties that violated the defendant's right to a fair trial; and (3) the judge's failure to instruct on the lesser included offense of assault and battery created a substantial likelihood of a miscarriage of justice. For the reasons we discuss, we reject the defendant's arguments and, after reviewing the entire case, decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

*Background.* The evidence presented at trial included the following. On September 28, 2001, Beverly police officers responded to a telephone call from 44 Cross Street in Beverly, where they found the victim, Edward White, dead. It is undisputed that the defendant killed the victim.

The victim, who was around sixty years of age at the time of his death, owned the house at 44 Cross Street; the defendant, then twenty-seven, lived with him as a caretaker and handyman. The two had been friends for several years and enjoyed a close relationship. From 1998 to 2000, the defendant spent approximately half his time living with the victim, and the other half living with his then girl friend. In the late summer of 2001 the defendant's relationship with his girl friend ended, and he returned to live full time at the victim's house.

During the evening of September 24, 2001, the victim and the defendant were in the victim's bedroom discussing the defendant's recent breakup with his girl friend. By that point, the defendant had consumed significant amounts of alcohol and was intoxicated. After the conversation ended, the victim, who was a homosexual, made a sexual overture toward the defendant. "[F]reaked out," the defendant responded by putting a pillow over the victim's head. A brief struggle ensued, and the victim got up from the bed and ran into the kitchen. The defendant tried to prevent the victim from screaming for help by trying to cover

---

[1] The Commonwealth also proceeded at trial on a theory of murder in the first degree based on deliberate premeditation.

the victim's mouth, but ended up tripping the victim and both men fell to the floor. The defendant began striking the victim with his hand, but then he grabbed a hammer from his nearby tool belt and began repeatedly striking the victim's skull with the hammer. The victim's injuries were extensive and included twenty-five lacerations to the scalp. These lacerations were consistent with blows from the hammer, and blunt head trauma was determined to be the cause of death.

Just before midnight on September 24, the defendant telephoned his cousin in Ohio, telling his cousin that "he had to get out of Massachusetts." The defendant's speech was "very fast paced, panicky." A little later, the defendant telephoned his father, who was working the night shift at a plant in Middleton. Shortly thereafter, the defendant, still intoxicated, drove to his father's workplace in the victim's automobile. The defendant told his father, "I think I killed [the victim]." At some point during the conversation, however, the defendant recanted, claiming that he had been joking. The defendant then left his father and drove back to 44 Cross Street. He cleaned the kitchen and dragged the victim's body back into the victim's bedroom and onto the bed, wrapped in blankets.

The victim previously had agreed to sell his house at 44 Cross Street to a Paul Sandberg, and arrangements had been made to execute the purchase and sale agreement on the afternoon of September 28. As the time for the signing drew near, the realtor informed Sandberg that the victim was "nowhere to be found." Concerned because of the victim's poor health, Sandberg drove to the house. On entering the victim's bedroom, Sandberg discovered the body and telephoned the police.

After a preliminary investigation, State and Beverly police officers obtained an arrest warrant for the defendant. They learned that the defendant had traveled to New York City, and accordingly they contacted the New York City police department. New York City police officers arrested the defendant at a hotel in that city early in the morning of September 29, 2001. State Trooper Robert Irwin and Beverly Detective John Bianchi, on learning that the defendant was in police custody, immediately drove to New York City, arriving there at 9:10 A.M. After being given Miranda warnings, the defendant agreed to speak with the Massachusetts police officers, and did so. In his statement,

which he signed, the defendant admitted to killing the victim and provided a narrative that detailed both the killing and events leading up to and following it.

At trial, the defendant presented a defense of intoxication and mental impairment. Dr. David Rosmarin, a board certified psychiatrist and expert witness for the defense, testified to his opinion that the defendant was highly intoxicated at the time of the incident, and suffering from symptoms of posttraumatic stress disorder (PTSD) as a result of having been sexually and physically abused as a child. The combined effect of intoxication and PTSD symptoms, the latter triggered on the night of September 24 by the victim's sexual advance toward the defendant, rendered the defendant incapable of deliberate premeditation, of forming the intent to kill or to cause grievous bodily injury, or of possessing the knowledge that his actions were of a character to cause a strong likelihood that death would result. Dr. Rosmarin also testified to his opinion that the nature of the blows inflicted by the defendant did not indicate extreme atrocity or cruelty but rather were evidence that the defendant had experienced a loss of control. In rebuttal, the Commonwealth called Dr. Malcolm Rogers, also a board certified psychiatrist. Dr. Rogers opined that at the time of the victim's death the defendant retained the capacity to deliberately premeditate, to form the intent to kill or cause grievous bodily injury, and the capacity to do so and to have knowledge of the acts that caused the victim's death.

*Discussion.* a. *Jury instruction on malice.* When the judge reached the substantive crimes at issue in the course of his final charge, he instructed the jury on the elements of murder in the first degree based on the theory of deliberate premeditation, murder in the first degree on the theory of extreme atrocity or cruelty, and murder in the second degree. In doing so, the judge followed the Model Jury Instructions on Homicide (1999), and in accordance with those model instructions, he separately defined the element of malice as it applied to each crime. Immediately after concluding his explanation of murder in the second degree, the judge stated the following:

> "As a general rule, you are permitted to infer that a person who intentionally uses a dangerous weapon on

another person is acting with malice. A dangerous weapon is an item which is capable of causing serious bodily injury or death.

"Whenever the defendant's knowledge or intent must be proved, the defendant's culpability rests upon proof of such knowledge or intent. The Commonwealth must prove the requisite knowledge or intent beyond a reasonable doubt in order to prove that the defendant committed the crime.[2] . . .

"Whenever the Commonwealth must prove the defendant's intention to do something, you should consider any credible evidence of mental impairment and/or the effect on the defendant of his consumption of alcohol in determining whether the Commonwealth has met its burden of proof. Likewise, whenever the Commonwealth must prove the defendant's knowledge of any facts or circumstances, you should consider any credible evidence of mental impairment and/or the effect on the defendant of his consumption of alcohol in determining whether the Commonwealth has met its burden of proof beyond a reasonable doubt.

"More particularly, you may consider any credible evidence of the defendant's mental impairment and/or consumption of alcohol in determining:

"Whether the defendant deliberately premeditated the killing of the deceased, that is, whether the defendant thought before he acted and whether the defendant reached the decision to kill after reflection at least for a short period of time.

"Whether the defendant intended to kill or to cause grievous bodily harm to the deceased or, relative to the third prong of malice, the nature and extent of the defendant's knowledge of the circumstances at the time he acted.

"Whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased.

"I reiterate, whenever the Commonwealth must prove that the defendant intended to do something, or had

---

[2]The judge then repeated this paragraph verbatim.

> knowledge of certain facts or circumstances, in order to prove the crime, you may consider any credible evidence of mental impairment and/or intoxication in determining whether the Commonwealth has met its burden of proving the defendant's intent or knowledge beyond a reasonable doubt."

The judge's instruction concerning the permissible inference of malice that may be drawn from the intentional use of a dangerous weapon (dangerous weapon inference instruction), as well as his instructions on evidence of mental impairment and alcohol consumption, are taken directly from the model homicide instructions. See Model Jury Instructions on Homicide, *supra* at 61-62. The defendant does not challenge as a general matter the principle expressed in the dangerous weapon inference instruction, namely, that when a defendant purposefully uses a dangerous weapon to inflict fatal wounds, a jury may, but is not required to, infer that the defendant acted with malice. It is a principle frequently cited with approval in our cases, including those where there is evidence of intoxication or mental impairment on the part of the defendant. See, e.g., *Commonwealth* v. *Oliveira*, 445 Mass. 837, 842-843 (2006); *Commonwealth* v. *Wallis*, 440 Mass. 589, 595 (2003). The defendant argues, however, that in this case, where the critical issue was whether the defendant's mental impairment and alcohol consumption together vitiated the necessary intent to constitute malice under any of its three prongs, the inclusion of the dangerous weapon inference instruction allowed the jury to find proof of malice based solely on his use of a dangerous weapon, and irrespective of his intoxication and impaired state of mind.[3] As the defendant did not object to the dangerous weapon inference instruction at trial, we review to determine if it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998).

---

[3] More specifically, the defendant suggests that the jury may have found he did not have the necessary capacity to form the intent under any of the three defined prongs of malice, but because of the dangerous weapon inference instruction, they latched onto the permissible inference of malice arising from the defendant's intentional use of a dangerous weapon (a hammer) and found the defendant guilty nonetheless. The defendant refers to the dangerous weapon inference instruction as creating a fourth prong of malice.

In evaluating a defendant's claim of error relating to a portion of a jury charge, we "consider the jury charge as a whole, 'looking for the interpretation a reasonable juror would place on the judge's words.' " *Commonwealth* v. *Belcher*, 446 Mass. 693, 696 (2006), quoting *Commonwealth* v. *Harbin*, 435 Mass. 654, 658 (2002). See *Commonwealth* v. *Oliveira*, 445 Mass. at 844 ("Jury instructions must be construed as a whole to prevent isolated misstatements or omissions from constituting reversible error where there is little chance that the jury would have misunderstood the correct import of the charge"). In this case, reasonable jurors presumably would understand from the dangerous weapon inference instruction that they were allowed to infer "malice" if they found that the defendant intentionally used a hammer to strike the victim. However, they would also understand from the judge's earlier instructions explaining the elements of murder in the first and second degrees that "malice" was a defined term — that is, one of the elements of murder with a precise meaning that varied depending on the theory and level of murder being considered — and that to find the defendant guilty of any degree or theory of murder, they must find the Commonwealth had proved the element of malice as the judge had defined it for that degree or theory.[4] The quoted instruction on mental impairment and intoxication was keyed explicitly to the definitions of the three prongs of "malice" that the judge had previously given the jury. In the circumstances, we do not consider it a realistic risk that the jury would ignore this strong and detailed instruction and fail to appreciate that the defendant's mental impairment and use of alcohol were factors to consider in relation to whether the Commonwealth had proved "malice."

The defendant also claims that although the judge phrased the dangerous weapon inference instruction by stating that the jury were permitted to draw an inference of malice only from the *intentional* use of a dangerous weapon, the jurors were "improperly precluded" from considering whether the defendant's mental impairment and alcohol consumption affected his capacity to intend the use of such a weapon. The claimed preclusion arose, the defendant contends, because the judge did not expressly tell

---

[4]The dangerous weapon inference instruction itself does not define the word "malice." See *Commonwealth* v. *Garcia*, 443 Mass. 824, 835-836 (2005).

the jurors that they might consider these types of impairments in relation to any use of a dangerous weapon by the defendant.

The argument lacks merit. Directly following his dangerous weapon inference instruction, the judge told the jurors that *"[w]henever"* the Commonwealth was required to prove the defendant's intent or knowledge, it must do so beyond a reasonable doubt in order to prove the defendant's guilt; and further that *"[w]henever* the Commonwealth must prove the defendant's intention to do something, [the jury] should consider any credible evidence of [the defendant's] mental impairment and/or the effect on the defendant of his consumption of alcohol in determining whether the Commonwealth has met its burden of proof" (emphasis added). By their terms, these instructions applied to the defendant's intentional use of a dangerous weapon, among other instances requiring proof of intent or intention.[5] There was no error in the judge's instructions and, accordingly, no substantial likelihood of a miscarriage of justice.

b. *Prosecutor's closing argument.* The defendant claims that various improprieties in the prosecutor's closing argument violated the defendant's right to a fair trial. As the defendant did not object at trial to any of the aspects of the prosecutor's closing that he now challenges, again we review his claims to determine whether a substantial likelihood of a miscarriage of justice exists. *Commonwealth* v. *Braley*, 449 Mass. 316, 329-330 (2007), citing *Commonwealth* v. *Allison*, 434 Mass. 670, 686-687 (2001).

(i) *Facts not in evidence.* The defendant first contends that the prosecutor argued facts not in evidence during his closing argument. In particular, he claims the prosecutor improperly argued that the defendant had willingly traded sexual favors for alcohol, an argument, according to the defendant, for which there was no support in the record.[6]

---

[5]In addition, the jury were provided written copies of the judge's complete instructions on murder, including the instructions quoted in the text, thereby increasing the likelihood that the jury would connect the need to consider the defendant's mental capacity and intoxication in relation to whether any use of a dangerous weapon by the defendant was intentional.

[6]The defendant's challenged focuses on the following statement by the prosecutor: "And you know from the facts, as we go through it, he was having sexual activities at fifteen and one half or fifteen because they would give him something he wanted, alcohol, and he would allow them to perform it."

It is first necessary to provide context. The parties stipulated that in the past, three different men had pleaded guilty to or had been found guilty by a jury of sexual crimes committed against Callum Miller, the defendant in this case; put another way, the parties stipulated that the defendant here had been the victim in three sexual assault prosecutions in the past. According to the stipulation, the crimes forming the bases for these convictions included incidents of both statutory rape and indecent assault and battery that occurred on different dates between June of 1988 (when the defendant was fourteen years old) and January of 1990, when the defendant turned sixteen. The judge read the stipulation to the jury, and told them that they could consider it as substantive evidence of the fact of these convictions. Evidence concerning the details of the various sexual assaults on the defendant that underlay these convictions, however, was presented only during cross-examination, redirect, and recross-examination of the two psychiatric expert witnesses. Accordingly, the judge several times informed the jury that such evidence was admitted not for the truth, but only for their consideration as part of the basis of the experts' opinions.[7] See *Commonwealth* v. *Brown*, 449 Mass. 747, 768 (2007); *Commonwealth* v. *Jaime*, 433 Mass. 575, 577-578 & n.1 (2001).

The prosecutor's remark that the defendant challenges on appeal, see note 6, *supra*, clearly relates to one or more of the sexual assaults at issue in the stipulated-to convictions. Although the defendant's challenge is not directed to this point, as just discussed, not all evidence concerning the details of those assaults was admitted substantively. Accordingly, by definition the prosecutor's remark was not based on facts "in evidence." Nevertheless, for several reasons we do not find a substantial likelihood of a miscarriage of justice requiring reversal.

First, although the judge did not correct the prosecutor at the time he made the remark, throughout the trial and in his final instructions, the judge told the jury that they and only they were the finders of the facts. He had informed them that the details

---

[7] There was no dispute that both expert witnesses, to varying degrees, based their opinions regarding the defendant's mental capacity on the sexual assaults of the defendant underlying the stipulated-to convictions, and that both experts attributed posttraumatic stress disorder (PTSD) symptoms to the defendant — although again to varying degrees — as a result of these sexual assaults.

of the sexual assaults were not admitted as substantive evidence, and he instructed them three times — at the beginning of the case, immediately before closing arguments, and during his final charge — that closing arguments were not evidence; he also emphasized two times that if the attorneys said anything that did not correspond to the jurors' memory, the jurors' collective memory should control. See *Commonwealth* v. *McIntyre*, 430 Mass. 529, 543 (1999) (judge's instructions that closing arguments were not evidence and jurors' memory of evidence should control helped to mitigate prosecutor's impropriety in substantively arguing evidence admitted for limited purpose). Second, while the evidence detailing the actual sexual assaults experienced by the defendant was not admitted for its truth, there is no dispute that the defendant was sexually assaulted by the three men who were convicted of the crimes, and that at trial, it was the defendant who sought admission of evidence about these assaults and convictions.[8] Third, the defendant's actual challenge on appeal — that the expert witnesses' testimony relating to the underlying sexual assaults provided no support for the prosecutor's argument about the defendant's engaging in sex in exchange for alcohol — is incorrect: the testimony of both experts supplied a reasonable basis for this point.[9] And finally, the defendant's experienced trial counsel did not object to the prosecutor's argument when it was made, supporting the view that the argument was not unfairly prejudicial. See, e.g., *Commonwealth* v. *Taylor*, 455 Mass. 372, 383-384 (2009), and cases cited.

For all these reasons, we conclude that the error here had a minimal effect on the jury; reversal is not required. See *Com-*

[8]The crimes were central to the opinion of Dr. Rosmarin that, on the night that the victim was killed, the defendant was suffering from symptoms of PTSD, and that that condition, combined with his intoxication, rendered him unable to form the necessary intent to commit murder.

[9]While, as the defendant points out, Dr. Rosmarin did testify that "the sexual abuse happened when [the defendant] was intoxicated and unable to effectively resist," the witness also conceded awareness that the defendant had given testimony under oath in one of the criminal cases to the effect that he had initially gone to the man's house in order to get drugs from the man and did not engage in sexual activity on that occasion, and at least on one other occasion had engaged in sexual relations with the man voluntarily, without being incapacitated by intoxication. Moreover, the Commonwealth's expert Dr. Rogers testified that the defendant's "pursuit of alcohol and other drugs was part of what got him into that situation [of exposure to sexual molestation]."

*monwealth* v. *Bregoli*, 431 Mass. 265, 277-278 (2000) (although prosecutor's argument was improper where he used evidence substantively in closing argument that was admitted only for limited purpose, any effect was minimal).

(ii) *Consideration of expert testimony*. The defendant next contends that the prosecutor improperly urged the jurors to ignore the testimony of the defendant's expert and thereby encouraged them "to find malice while ignoring the defense." We disagree.

In determining whether an argument was improper, we examine the remarks "in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Gaynor*, 443 Mass. 245, 273 (2005), quoting *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992). In his closing argument, defense counsel repeatedly exhorted the jury to resist the prosecutor's anticipated request that they give the defense expert's testimony little weight. The prosecutor was entitled to respond to such an argument. See, e.g., *Commonwealth* v. *Whitman*, 453 Mass. 331, 346 (2009) (prosecutor entitled to respond to defense argument that defendant suffered from mental impairment and thus could not be held criminally responsible). The general thrust of the prosecutor's argument was that Dr. Rosmarin's testimony was not trustworthy or credible and therefore should not be given any weight by the jury. The prosecutor then went on to say that if the jury followed that suggestion, it might be equally appropriate for them to decline to give any weight to the Commonwealth's expert, Dr. Rogers. Perhaps the argument qualified as "enthusiastic rhetoric," *Commonwealth* v. *Costa*, 414 Mass. 618, 629 (1993), but it fell within the bounds of permissible advocacy. See *id.* Moreover, the fact that the defendant did not object, "[a]lthough not dispositive of the issue, . . . is some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985).

(iii) *Exhortation to the jury*. The prosecutor ended his closing with the following statement: "Members of the jury, [the defendant] is responsible for what he did and it's a tough and sad decision you have, but you're sworn to do it. And you should." The defendant argues that the prosecutor improperly implied in

this argument that it was the jury's duty to convict. As the Commonwealth concedes, the comment could be interpreted so to suggest, and to that extent it exceeded the bounds of permissible argument. See *Commonwealth* v. *Adams*, 434 Mass. 805, 822 (2001), citing *Commonwealth* v. *Degro*, 432 Mass. 319, 328 (2000).

However, while the statement should not have been made, the defendant was not deprived of a fair trial. See *Commonwealth* v. *Degro, supra* at 329. Again, there was no objection by the defendant's trial counsel, suggesting that the tone of the remark was not a call to arms. See *Commonwealth* v. *Mello*, 420 Mass. 375, 380 (1995); *Commonwealth* v. *Deloney*, 59 Mass. App. Ct. 47, 53 (2003) (brief exhortation to convict at end of closing that spanned eleven pages of transcript, while improper, was not prejudicial). Moreover, as previously mentioned, the judge repeatedly instructed that the closings were not evidence and that the case should be decided solely on the evidence, not passion or sympathy. Viewed in this light, there was no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Francis*, 450 Mass. 132, 140-141 (2007).

(iv) *Combined effect of claimed errors.* Finally, the defendant argues that the combined improprieties in the prosecutor's closing denied him a fair trial and require reversal of his conviction. We have discussed above each of the defendant's claimed errors. Although we have agreed with the defendant that there were two errors, neither alone nor in combination did they create a substantial likelihood of a miscarriage of justice.

c. *Lesser included offenses.* The defendant maintains that the evidence presented at trial warranted an instruction on the lesser included charge of assault and battery, and the judge's failure to give such an instruction, sua sponte, again resulted in a substantial likelihood of a miscarriage of justice. The argument is premised on the evidence, contained in the defendant's statement to the police, that the defendant first hit the victim with his hand before he struck the victim repeatedly with the hammer, thereby causing the victim's death. The defendant theorizes that the jury could have found that while the defendant lacked the capacity to act with malice — necessary for murder — he nonetheless was capable of forming the necessary level of intent for assault and battery with the hand. Therefore, the defendant contends,

the jury rationally could have convicted the defendant of the latter offense and acquitted him of the former.

Assault and battery is a recognized lesser included offense of murder. See *Commonwealth* v. *Pimental*, 454 Mass. 475, 482 n.5 (2009), citing *Commonwealth* v. *Myers*, 356 Mass. 343, 350 & n.1 (1969). There is no requirement, however, that a judge give an instruction on a lesser included offense that might be supported by the trial evidence in the absence of a request by the defendant or the Commonwealth. See *Commonwealth* v. *Berry*, 431 Mass. 326, 336-338 (2000). Here, there was no such request by either side, and in any event, the defendant's argument that assault and battery as a lesser included offense was raised by the evidence lacks merit.

In relevant part, the defendant's statement to the police — the factual predicate of his argument on the lesser included offense — reads as follows:

> "[The victim] got up and exited his room and went for the kitchen. [He] started to scream help, and I tried to cover his mouth. I didn't mean it, I tripped him, we both went down on the floor, I was on top of him hitting him. *At first I hit him with my hand. Then I had my tool belt really close and I grabbed it. I was hitting him in the head with a hammer. I hit him more than once, I don't know how many times.* He was moving a little bit, I ran into the kitchen drawer and grabbed a knife. . . . He stopped moving, then I saw blood on the floor." (Emphasis added.)

As this statement indicates, the blows he inflicted on the victim, by hand and by hammer, were all delivered essentially at one time. There is no realistic way to separate the blow with the hand from those delivered with the hammer; as described by the defendant, they merged together in the attack that killed the victim. Cf. *Commonwealth* v. *Gunter*, 427 Mass. 259, 275 (1998) (concluding that assault on victim was not sufficiently independent act and thus merged into greater offense of murder). Cf. also *Commonwealth* v. *King*, 445 Mass. 217, 225 (2005), cert. denied, 546 U.S. 1216 (2006) (when defendant is convicted of two crimes, and one is lesser included offense of other, convictions of both offenses must be based on separate and distinct acts).

*Review under G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E. We find no reason to exercise our authority to reduce the degree of guilt or order a new trial.[10]

*Judgment affirmed.*

---

[10]At oral argument in this case, the question was raised whether the defendant might have been entitled to an instruction on involuntary manslaughter at trial. We have considered this question and conclude that on the record of this case, there was no basis for such an instruction. See *Commonwealth* v. *Sanna,* 424 Mass. 92, 106 (1997). See also *Commonwealth* v. *Sires,* 413 Mass. 292, 302-303 (1992).