NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12094


COMMONWEALTH  vs.  JAMES RUTHERFORD.



Worcester.      November 10, 2016. - March 16, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, & Lowy, JJ.


Homicide.  Practice, Criminal, Argument by prosecutor, Capital
    case.  Evidence, Prior misconduct, State of mind.




Indictments found and returned in the Superior Court
Department on September 23, 2011.

The cases were tried before Janet Kenton-Walker, J.


Jennifer H. O'Brien for the defendant.
Ellyn H. Lazar-Moore, Assistant District Attorney, for the
Commonwealth.


GAZIANO, J.  A Superior Court jury convicted the defendant

of murder in the first degree on theories of deliberate

premeditation and felony-murder, in the July, 2011, death of

Francis Spokis.[1]  At trial, the defendant conceded that he and

_____

[1] Indictments charging the defendant with armed robbery and
assault and battery by means of a dangerous weapon were

his girl friend broke into the victim's home, robbed him, beat him, and stabbed him to death.  The defendant contended, however, largely through the testimony of an expert witness, that he was incapable of forming the intent required for murder because he was impaired by mental illness.  The defendant raises two claims in this direct appeal.  First, he argues that the prosecutor exceeded the bounds of permissible closing argument by engaging in a personal attack on the defendant's expert witness, referencing facts not in evidence, and appealing to juror sympathy.  Second, the defendant maintains that the trial judge erred by allowing the prosecutor to introduce unfairly prejudicial evidence of uncharged misconduct.  The defendant also asks us to invoke our extraordinary power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the verdict.  For the reasons that follow, we affirm the conviction and decline to grant relief under G. L. c. 278, § 33E.

1. Facts. We recite the facts that the jury could have found, reserving some facts for later discussion of particular legal issues at hand.  In the summer of 2011, the defendant and his girl friend, Lee Anne Chesko, planned to rob the victim at his house in Rutland over the Fourth of July holiday weekend. The victim's wife and daughter were scheduled to take a vacation

---

dismissed at the conclusion of the trial on the Commonwealth's motion.

in Maine that weekend, while he remained behind to do some work on the house.

The victim had met Chesko approximately six months earlier, and they had entered into a relationship whereby the victim gave Chesko money and drugs in exchange for sex. Most of their encounters took place at a Worcester auto body shop owned by the victim. Eventually, the victim allowed Chesko to visit at his house, and paid the costs of tuition so that Chesko could return to college.

The defendant and Chesko recruited their former roommate, Rody Zapata, to help with the robbery. The defendant told Zapata that the victim had a safe at his auto body shop, and Chesko told him that the victim kept large amounts of cash in it. The plan was that Chesko would meet the victim at his home and alert the defendant and Zapata that the two were alone in the house. The defendant and Zapata were to break into the victim's house wearing masks or bandanas and tie him up. They also planned to tie up Chesko (to disguise her participation in the robbery), after which the defendant and Zapata would drive the victim to the auto body shop to open the safe.

The defendant told several relatives and a friend that he was planning to rob someone. He asked Luz Hernandez if he could store some items he planned to steal in a locked storage area

behind her apartment building; she agreed and gave the defendant a key to the storage area.

On July 4, 2011, the defendant, Chesko, and Zapata drove to a wooded area near the victim's house. The defendant got out of the vehicle to "scope out" the house. While the defendant was away from the vehicle, Chesko told Zapata that they would have to kill the victim if he found out that she was involved in the robbery. The defendant returned to the vehicle and removed some knives from the trunk. Unnerved by the prospect of being caught and "getting in trouble," Zapata decided not to continue with the plan, and the defendant and Chesko drove him back to his house. Chesko was upset with Zapata; the defendant told her that "everything was going to be all right."

At some point after July 4, 2011, the defendant and Chesko returned to the victim's house without Zapata. They beat the victim and stabbed him multiple times, including five stab wounds to his neck. They ransacked the house, stealing a number of items, among them two television sets, a video game console, jewelry, and several rifles. The two drove to Hernandez's apartment, where Hernandez agreed to buy one television for $500, and placed it in her living room. The defendant made several trips carrying the other items to the storage area, while Chesko waited in the vehicle.

The victim's wife returned home on July 10, 2011. As the victim's wife approached the house, she immediately noticed a pile of newspapers outside the front door, and that the doors to their dog kennel and shed were open. She found the interior of the house in shambles; cabinets were standing open with items spilled from them, furniture was knocked over and displaced, and there were blood stains on the floors. She also noticed that two televisions were missing, as were her jewelry and the key to the victim's gun safe.

She contacted the Rutland police, who responded to the house to investigate a suspected burglary. A detective noticed that one of the front window screens was torn. He saw two distinct sets of bloody footprints in the kitchen, and noted that someone had written "Don't Do Drugs" in black permanent marker on the kitchen table. He followed a blood trail leading down the stairs to the basement, where he found the victim's body under an open area beneath the stairs. The victim had died as a result of blunt trauma to his head, and stab wounds to his head, neck, and leg.

On July 13, 2011, while conducting surveillance near the defendant's mother's house in Rutland, police saw the defendant driving, and followed him to Worcester, where he was stopped; the defendant agreed to accompany them to the State police barracks in Millbury. After the defendant got out of the

vehicle, one of the officers noticed a military-style ammunition canister on the seat, with visible blood-stained fingerprints, and searched the vehicle. Blood was also present on areas of the front seat, the glove compartment, the door panel, and the dashboard. Deoxyribonucleic acid testing of the blood stains on the ammunition canister matched the victim's blood. The officers also recovered a set of keys that the defendant had left in the vehicle when he was stopped; one of the keys was to Hernandez's storage area.

Police then searched Hernandez's apartment. When they entered the living room, one of the officers saw a group of children watching a large television, one of those that had been stolen from the victim's house, with a visible blood stain on it. Police recovered jewelry, rifles, a video game box, and other items of the victim's property from the storage area and from locations in Hernandez's apartment. A fingerprint and two palm prints of the defendant were on one rifle, and his palm print was on another. Police also found a plastic bag containing blood-soaked clothing and gloves, a hat, a pair of boots, a pair of shoes, and two cellular telephones. The shoes were later matched with the bloody footprints on the victim's kitchen floor.

At trial, the defendant did not contest that he had participated in the crime. Rather, he argued that he could not

be found guilty of murder because his mental state had been diminished by a combination of severe depression over his cousin's recent suicide, drug use and drug withdrawal, sleep deprivation, and Chesko's coercion and manipulation. The defendant called an expert witness in support of his theory of diminished capacity. The defendant also called several witnesses to testify to his good character and reputation as a leader in high school, before his cousin's suicide and his extensive drug use, and the abrupt change that the witnesses had noticed in his behavior.

The judge instructed the jury on all three theories of murder in the first degree. The jury found the defendant guilty of murder in the first degree on the theories of deliberate premeditation and felony-murder.

2. Discussion. In this direct appeal, the defendant raises two primary claims of error. First, he argues that portions of the prosecutor's closing argument so exceeded the bounds of proper argument, by inflaming the jury and unfairly engaging in ad hominem attacks against the defendant's key witness, and referring to facts not in evidence, that a new trial is required. Second, the defendant argues that the judge erred in allowing the Commonwealth to introduce unfairly prejudicial evidence of uncharged misconduct, which only further served to rouse the jury's emotions.

a.  Prosecutor's closing argument.  While prosecutors are entitled to argue "forcefully for the defendant's conviction," closing arguments must be limited to facts in evidence and the fair inferences that may be drawn from those facts. Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).  Within this framework, however, a prosecutor may attempt to "fit all the pieces of evidence together" by suggesting "what conclusions the jury should draw from the evidence" (citation omitted). Commonwealth v. Burgess, 450 Mass. 422, 437 (2008).

i.  Personal attack on defense expert.  The defendant first argues that the prosecutor improperly disparaged his expert witness, Dr. Fabian Saleh, a psychiatrist and assistant clinical professor of psychiatry, engaging in repeated ad hominem attacks against the expert and his employment at Harvard University Medical School.  The challenged statements include references to Saleh as not being a "human being," and a repeated suggestion that an expert medical opinion, unlike evidence such as bloody footprints, was not "real evidence," and thus should not be taken into consideration in the jury's deliberations.

At one point in his closing, the prosecutor argued:

> "Dr. Saleh needs to get out of the Harvard Medical School, he needs to get out of his office, he needs to stop flying around the world and writing papers and needs to become a human being so he can figure out what facts really count."

At another point, the prosecutor said:

"They were getting away with it.  You know how many injuries [the victim] had.  You know what a beating he had taken.  They didn't have to step in here, him and Chesko, and take his life.  They had to think ahead to do it.  It's not one stabbing.  Think of the autopsy, how many stab wounds it is.  And that's the evidence, real physical evidence . . . -- not sitting alone, writing papers at the Harvard Medical School -- real evidence, real facts that human beings rely on to make their decisions about what makes sense."

Although the defendant objected at trial to other portions of the closing, he did not object at that time to these particular statements.  Thus, we consider whether there was error and, if so, whether it created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Mello, 420 Mass. 375, 379-380 (1995).  While a few of the remarks were unfortunate and may have been inappropriate, we discern no substantial likelihood of a miscarriage of justice in the prosecutor's comments on the expert's testimony.

"Within reason, prosecutors may be critical of the tactics utilized by trial counsel in defending a case."  Commonwealth v. Fernandes, 436 Mass. 671, 674 (2002), quoting Commonwealth v. Awad, 47 Mass. App. Ct. 139, 141 (1999).  Here, defense counsel argued that "the crux of this case" was Salah's credibility. Defense counsel urged the jury to accept Salah's expert opinion because he was "internationally renowned" and has "impeccable credentials," which include teaching at Harvard Medical School and lecturing to Superior Court and appellate judges.

While certain of his remarks might have been better left unsaid, the prosecutor was entitled to respond to the defendant's argument by asking the jury to look beyond Salah's curriculum vitae and to examine the validity of Salah's opinion. See Commonwealth v. Whitman, 453 Mass. 331, 346 (2009). The prosecutor pointed out that the expert witness failed to consider "the facts [that] really count." He argued, in effect, that Saleh's opinion discounted many commonsense incriminating facts in evidence that demonstrated that the defendant was able to form the intent to kill and rob the victim. Comments directed at the reliability of an expert's opinion do not exceed the bounds of permissible argument. See Commonwealth v. Miller, 457 Mass. 69, 79 (2010); Commonwealth v. Cosme, 410 Mass. 746, 752 (1991).

The statement that Salah "needs to become a human being" was inappropriate and should not have been made. Viewed in isolation, the remark risked crossing the line into an impermissible personal attack on an expert witness. See Commonwealth v. Bishop, 461 Mass. 586, 597-599 (2012). In the context of the closing as a whole, however, the jury would have been able to understand the remark as a "manifestly sarcastic and hyperbolic" comment. See Cosme, 410 Mass. at 754. See, e.g., Wilson, 427 Mass. at 350 (jury are presumed to understand that prosecutor is advocate, and statements that are

"[e]nthusiastic rhetoric, strong advocacy, and excusable hyperbole" do not require reversal). That defense counsel objected to some portions of the prosecutor's closing, but not to these particular comments, also suggests that he did not view the remarks about Saleh as prejudicial. Commonwealth v. Walker, 421 Mass. 90, 104 (1995).

   ii. Arguing facts not in evidence. The defendant maintains that the prosecutor's comment that, when officers arrived at Hernandez's apartment, her children were watching the children's television program "Barney & Friends" on the victim's bloodstained television was improper. The prosecutor said, "They still had blood on the TV set when Luz Hernandez's kids were watching Barney, for gosh sakes. Now, we don't know if they were watching Barney, but they were small children. They were watching some show like that." The defendant points out, as well, that there was no evidence of the children's ages or which television show they were watching.

   The prosecutor's acerbic comment, was, as the defendant argues, better not made. Nonetheless, the single remark that "small children" at Hernandez's home were "watching Barney" on a bloodstained television when the police arrived was an evident piece of hyperbole, readily understood as such by the jury. See Commonwealth v. Costa, 414 Mass. 618, 629 (1993). While the particular program "Barney" and the specific ages of the

children were not in evidence, these facts were not relevant to any portion of the case, and the focus of the statement was based in fact. There was evidence that children were watching television when the police arrived, and that the television had blood on it. In addition, the prosecutor immediately acknowledged in his next statement that portions of the comment were speculation, saying, "Now, we don't know if they were watching Barney, but they were small children. They were watching some show like that. And that blood's still on the TV set."

iii. _Playing to jurors' sympathy_. The defendant argues that the prosecutor impermissibly appealed to the jurors' sympathy on multiple occasions. The defendant points in particular to the prosecutor's comments that the victim's life was worth $500 to the defendant; his urging that the jurors place themselves in the victim's shoes and imagine his final thoughts; and his argument that the victim was "crawling away to die," leaving bloody hand and knee prints on the floor, after giving up any hope of survival. We agree that some of these remarks were inappropriate and designed to inflame the jury. See Commonwealth v. Bois, 476 Mass. 15, 34 (2016) ("Prosecutorial 'appeals to sympathy . . . obscure the clarity with which the jury would look at the evidence and encourage the jury to find guilt even if the evidence does not reach the level

of proof beyond a reasonable doubt'" [citation omitted]). The defendant objected to these remarks at the end of the prosecutor's closing, and the judge conducted a sidebar hearing on the objection; accordingly, we review for prejudicial error. See Commonwealth v. Parent, 465 Mass. 395, 399 (2013).

In closing, the prosecutor said, "[The defendant] had to get rid of that TV set so fast, he sold it to . . . Hernandez for five hundred dollars. That was the value of [the victim] lying dead in that house, five hundred dollars." He also said, "Do you think [the victim] went down there thinking he was going to call 911? Was [the victim] in a position where he was going to get help? No. He was down there dying." The prosecutor then asked the jury to imagine the victim's last thoughts, arguing, "Those last thoughts, reasonably, in his mind: I've had enough. I've been beaten. I've been stabbed. My house has been ransacked. I've been thrown down my own stairs. I'm staring up at my own ceiling and the cement around the basement of my home." The prosecutor asked the jurors to imagine the victim crawling down into his basement to die:

> "How bad was it? What does the evidence show how bad it was? You saw the tracks, spots of blood on the way from the bottom of the stairs to under the stairs. Reasonably, based on the evidence, those are his knee prints and his hand prints. He can't walk. He can't walk from that puddle of blood that he's dying in with the duct tape there. He has to crawl. He's not crawling for help. He's going the opposite way of the stairs. He's not calling to

911.  He's going away from the phones.  He's crawling away to die."

These portions of the prosecutor's closing were inappropriate and impermissible, exceeding the bounds of zealous argument.  It was impermissible for the prosecutor to argue that the defendant thought the victim's life was worth $500 based on the fact that the defendant sold one of the victim's television sets, among many stolen items, for $500.  See Commonwealth v. Worcester, 44 Mass. App. Ct. 258, 264 (1998).  The comment drew an improper inference that unfairly invited the jury to decide the case based on sympathy for the victim.  Id.  It also was impermissible for the prosecutor to ask the jury to imagine the victim's final thoughts.  Commonwealth v. Bizanowicz, 459 Mass. 400, 420 (2011).  "The jury should not be asked to put themselves 'in the shoes' of the victim, or otherwise be asked to identify with the victim."  Id., citing Commonwealth v. Thomas, 400 Mass. 676, 684 (1987).

As to the defendant's contention that the prosecutor referred to facts not in evidence when he argued that the victim crawled on his hands and knees to the location where he died, the judge and the attorneys discussed the state of this evidence at sidebar.  The prosecutor argued that the blood trails on the basement stairs and floor would support an inference that the victim was crawling, not standing.  The judge said, "All right."

We agree that the photographs of the bloodstains on the basement floor, and the testimony of the officer who found the victim's body, support such an inference.

Having concluded that portions of the prosecutor's closing argument were improper, we must determine whether the impermissible statements, in the context of the entire argument, require a new trial. In reaching such a determination, we consider "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." Commonwealth v. Kater, 432 Mass. 404, 422-423 (2000), citing Commonwealth v. Kozec, 399 Mass. 514, 518 (1987).

Here, in the context of the argument as a whole, and given the overwhelming evidence against the defendant, we conclude that there is no need for a new trial. With respect to some of the prosecutor's more egregious comments, the judge mitigated the possibility of prejudice by specifically instructing the jury to disregard the comment, in particular the speculation concerning the victim's final thoughts. She noted, "In this case, the closing argument by the prosecution, talking about the last thoughts of the decedent is not evidence in this case. It

is not to be considered by you as such." The judge instructed more generally at the beginning of the trial, before the closing arguments, and in her final charge that closing arguments are not evidence. She also reminded the jury, at the beginning of the trial and in her final charge, that they were to decide the case based on the evidence, and not sympathy or bias.

Moreover, in light of the strength of the Commonwealth's case, and the disturbing, properly introduced evidence of the condition of the victim, see Bois, 476 Mass. at 35, the prosecutor's improper and obviously hyperbolic statements were likely to have had but little effect on the jury. See, e.g., Commonwealth v. Roberts, 433 Mass. 45, 55 (2000). It is also significant that the jury did not "blindly accept the prosecutor's arguments," as evidenced by their decision not to convict the defendant on the theory of extreme atrocity or cruelty. Bois, supra. See, e.g., Commonwealth v. Gaynor, 443 Mass. 245, 273 (2005) (prosecutor's brief argument that victim's life was worth twelve-dollar value of pawned jewelry did not create substantial likelihood of miscarriage of justice).

b. Prior bad acts. The defendant argues that the judge abused her discretion in allowing the prosecutor to introduce evidence of uncharged misconduct by the defendant. A Worcester police detective testified that, one week before the killing, he found the defendant late at night, crouched behind a vehicle in

a registry of motor vehicles parking lot.  The officer conducted a patfrisk and found the defendant in possession of a knife, a pair of black gloves, a pellet gun, and Chesko's purse.  The defendant explained that he was having trouble with "people on the streets" and needed the weapons for protection.  The officer confiscated the knife and the pellet gun, but did not arrest the defendant or charge him with a crime.[2]

The judge allowed the Commonwealth to introduce this evidence as relevant to the defendant's state of mind.  She then immediately instructed the jury that the defendant's prior possession of a pellet gun and a knife could not be considered as "any . . . proof whatsoever that he committed the crime with which he's been charged."  The evidence was admissible, she instructed, "solely on the issue of his state of mind as it will be addressed in this case as it proceeds."  In her final charge, the judge repeated the instruction that the evidence was limited to establishing the defendant's state of mind.  She added, "You

---

[2] At a preliminary hearing on the Commonwealth's motion in limine to introduce the bad act evidence, the judge informed the parties that she would reserve her ruling pending a voir dire of the police officer.  Due to some apparent confusion between the parties as to a possible stipulation, the judge did not conduct a voir dire hearing.  At trial, the defendant objected to the testimony that he had carried a knife and a pellet gun.  The judge allowed the Commonwealth to show these items to the jury, and determined that any prejudice from the police officer displaying the weapons in court "can be cured by instructions of what they can consider it for."

cannot use this evidence as proof the defendant is a man of bad character with a propensity to commit criminal acts."

Evidence of a defendant's prior or subsequent bad acts is not admissible to show "bad character or criminal propensity" (citation omitted). Commonwealth v. Lally, 473 Mass. 693, 712 (2016). It may be admitted where it is relevant to show a nonpropensity purpose such as "common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." Commonwealth v. Helfant, 398 Mass. 214, 224-225 (1986), and cases cited. The Commonwealth is required to demonstrate that the probative value of the evidence is not outweighed by the risk of unfair prejudice to the defendant. Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). We review questions of admissibility, probative value, and unfair prejudice under an abuse of discretion standard. See id. at 252. We do not overturn a trial judge's decision on these issues absent a clear error of judgment in weighing the relevant factors. L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Here, the judge did not abuse her discretion in allowing introduction of the officer's testimony and the weapons to demonstrate the defendant's state of mind. The defendant argued that he lacked the capacity to form the intent to murder or rob because of depression, drug use and drug withdrawal, sleep deprivation, and coercion by his girl friend. The incident in

the parking lot tended to undermine the defendant's claim that he lacked the capacity to commit the crime. It demonstrated that, one week before the killing, the defendant carried weapons (including a knife, the type of weapon used to kill the victim) because he was having problems with individuals on the street, as opposed to carrying weapons because he had a drug addiction, was sleep deprived, was suffering from mental illness, or was manipulated into doing so by Chesko. See Commonwealth v. Philbrook, 475 Mass. 20, 26-27 (2016) (prior bad act evidence of defendant's attack on another individual admissible to show state of mind on date of killing).

The probative value of the uncharged misconduct evidence outweighed the risk of unfair prejudice. The incident in the registry of motor vehicles parking lot, which was not serious enough to result in the defendant's arrest, paled in comparison to evidence offered at trial concerning the defendant's conceded participation in the victim's brutal death. See Commonwealth v. Carriere, 470 Mass. 1, 16 (2014). The incident also received minimal attention at trial. Commonwealth v. McGee, 467 Mass. 141, 158 (2014). The Worcester police detective's testimony about the incident was brief, and the prosecutor did not mention the incident in his closing. See Commonwealth v. LeBeau, 451 Mass. 244, 261 (2008). Furthermore, the judge minimized the prejudicial impact of the evidence by providing the jury with

thorough limiting instructions.  See <u>Commonwealth</u> v. <u>Walker</u>, 442 Mass. 185, 202 (2004).

c.  <u>Review pursuant to G. L. c. 278, § 33E</u>.  We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the conviction to a lesser degree of guilt.

<u>Judgment affirmed</u>.