Following a trial in the Superior Court, the defendant, Bienvenido Jerez, was convicted of one count of stalking in violation of a restraining order, G. L. c. 265, § 43(b ) ; two counts of violating a restraining order, G. L. c. 209A, § 7 ; and two counts of intimidation of a witness, G. L. c. 268, § 13B. These convictions arose from the defendant's multiyear campaign of mailing letters full of overt and thinly-veiled threats to his estranged wife (victim) and people close to her.[2] On appeal, he argues that the Commonwealth presented insufficient evidence to sustain a conviction as to four of the five indictments.[3] Alternatively, he seeks a new trial on all charges, on grounds that the judge erred by (1) admitting certain evidence of prior bad acts and (2) inadvertently instructing the jury that they could consider previously excluded evidence regarding a witness's ability to identify the defendant's handwriting. We affirm.
Background. We summarize the facts the jury could have found, viewing the evidence in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), and reserving some facts for our discussion.
The defendant and the victim married in 1998. Within three years, they had a daughter together and moved to Plaistow, New Hampshire. By late 2005, their relationship had deteriorated, with the victim coming to fear the defendant and his increasingly controlling personality. As a result, she left the marital home with the daughter and moved to neighboring Haverhill, Massachusetts. Despite the separation, the defendant continued to pursue the victim, constantly calling her by telephone, following her as she went about her daily life, approaching her in public, and acting in a belligerent manner.
In August, 2006, the victim was at the residence of a man she had been seeing prior to the separation, and who would later become her fiancé, when the defendant appeared outside, smashing the windows on her vehicle and calling her cellular telephone (cell phone). She summoned the police and the defendant was charged in Lawrence District Court with malicious destruction of property (Lawrence charges). She also obtained a G. L. c. 209A abuse prevention order, but the defendant continued to call and convinced her to let it lapse after ten days.
Later in 2006, the defendant was taken into Federal custody on an unrelated matter and eventually came to be confined at a correctional facility in Pennsylvania. While there between 2009 and 2013, he engaged in the mailing campaign at issue. Overwhelmed and scared by the mailings, the victim secured two abuse prevention orders, the first effective from January 11, 2010, to February 9, 2012 (2010 order), and the second from March 19, 2012, through the time of trial (2012 order). Both orders prohibited the defendant from, among other things, having direct or indirect contact, including in writing, with the victim and the daughter. The 2012 order also prohibited such contact with the victim's mother. The defendant, however, was not deterred by either order. To the contrary, he sent out hundreds of mailings to and about the victim while incarcerated in Pennsylvania. More than twenty were sent directly to her. The balance were sent to, among others, the daughter, and the victim's mother, fiancé, stepfather, brother, and employer.[4] The victim intercepted the mailings to the daughter and fiancé, both of whom resided with her. Other recipients shared the mailings with her. The victim, in turn, shared many of the mailings with the police, who, on at least three occasions, brought charges against the defendant for violating the 2010 order.
The defendant enclosed copies of various documents in his mailings, including: the definition of the word "marriage"; an alleged civil complaint against the victim for "violat[ing] the marriage contract by committing adultery"; a letter he fabricated on letterhead from the district attorney's office, which purported to confirm that one set of the abuse prevention order violation charges had been dismissed due to the victim's failure to provide supporting documentation;[5] and communications he purportedly had from prison urging New Hampshire authorities to bring felony charges against the victim for cutting him with a knife in 2005, including copies of hospital records he altered to support the allegation.
The defendant also enclosed handwritten or typed letters in his mailings, wherein he repeatedly referred to the victim as a "bitch" and "whore" who had been "unfaithful," complained about her ongoing communication with the police, and boasted of having "nothing to lose," and no fear of the law.[6] He also repeatedly referred to his reputation as a "gangster," "thug," "hoodlum," and "maniac" prone to doing "crazy" things. He even warned that he had "little gangsters" on the street to "maneuver" the "situation" in Haverhill while he was incarcerated. Furthermore, he wrote of his anger toward the victim and intention to come after her upon his release. To that end, he made it known that his release date was approaching in late 2013. On August 22, 2013, however, he was indicted on the present charges.
Discussion. 1. Sufficiency of the evidence. a. Stalking. The defendant was convicted of stalking in violation of an abuse prevention order on various dates between January 1, 2009, and August 13, 2013. He claims that the conviction cannot stand because the Commonwealth failed, in two respects, to establish that he made a threat with the intent to place the victim in imminent fear of death or bodily injury. See G. L. c. 265, § 43(a ) and (b ) ; Edge v. Commonwealth, 451 Mass. 74, 76 (2008).[7]
First, he contends that after 2009, his mailings were not sent to the victim, but to others. However, direct communication with the victim is not required under G. L. c. 265, § 43(a )(2). See Commonwealth v. Walters, 472 Mass. 680, 693 (2015). In cases "[w]here communication of the threat is indirect-for example, through an intermediary-the Commonwealth must prove ... the defendant intended the threat to reach the victim." Ibid. The proof can be circumstantial. See ibid. Here, the victim testified that she herself received over twenty mailings from the defendant since 2009. And, while she threw most of them away, two were introduced at trial, and both were sent on January 26, 2010, within the relevant time period. Even without those mailings, the defendant did not merely send the remaining mailings to other people; he sent mailings all about the victim to people close to her, including her daughter and fiancé, who lived with her. The defendant's choice of recipients was strong evidence of his intent that the threats reach her. See Commonwealth v. Hughes, 59 Mass. App. Ct. 280, 282-283 (2003). Moreover, he acknowledged in letters that he was aware that his mailings were being shared with the victim and even urged recipients to tell her of his threats. Indeed, he wrote to the victim's mother as follows: "Tell your whore ass daughter to keep her mouth shut until I get out. She will have the opportunity to say all that shit she has been saying to my fucking face ..." The evidence of the defendant's intent to have his threats communicated to the victim was overwhelming.
Second, the defendant argues that the content of the mailings would not lead a reasonable person in the victim's position to suffer imminent fear of death or bodily injury. He suggests that, "[a]t most they were merely words of a man upset at the decline of a marriage." This claim is unavailing. The defendant made known that he was "really fucking mad" and had a "thirst for blood, "due to his perception that the victim had been unfaithful as well as her ongoing communication with authorities.[8] He also made known his intention to act on that anger upon his release. On one occasion, he warned the victim's mother, "You probably think I [am] just talking but there is no talking any more. I just want that bitch to say all the shit she was saying in my face and then we will get it started. I am going to make sure motherfuckas know I am not the one to be fucked with. The closer that I get the more aggressive I get." On other occasions, he wrote of his intention to release his "demons" and "gangsta shit" on the victim. The "only way to stop me," he once warned, "is to kill me."
"A 'true threat' need not take the form of an explicit statement that the speaker intends to cause imminent, physical harm to the victim, but may comprise 'words or actions that-taking into account the context in which they arise-cause the victim to fear such harm now or in the future.' " Walters, supra at 691, quoting from O'Brien v. Borowski, 461 Mass. 415, 425 (2102). Based on the overwhelming evidence adduced at trial, we have no difficulty determining that the content of the defendant's mailings could lead a reasonable person in the victim's position to suffer imminent fear of death or bodily injury, and, therefore, that the defendant's words amounted to true threats.
b. Violation of abuse prevention order. The defendant was convicted of violating the "no contact" provision in the 2012 order by sending an April 5, 2012, letter to the daughter. This required proof that (1) an abuse prevention order was in effect; (2) the defendant knew about the order; and (3) he violated it. See Commonwealth v. Kulesa, 455 Mass. 447, 452 (2009). The defendant contends that the Commonwealth failed to establish the last two elements.
First, he argues that the Commonwealth could not prove that he knew of the 2012 order when he sent the April 5, 2012, letter, because he was served with the order that same day. In fact, he was served with the order, in hand, at 10:14 A.M. The letter, meanwhile, was thirteen pages in length. A reasonable jury could infer that the letter took time to write, and it is not equally likely that it was sent before, as opposed to after, 10:14 A.M. Cf. Commonwealth v. White, 422 Mass. 487, 494 (1996) ("a case cannot be proved if the evidence [is entirely circumstantial and] equally supports two inconsistent propositions"). In addition, the defendant sent a second letter on April 5, 2012, to the victim's mother, wherein he mentioned sending the letter to the daughter and stated, "that whore [the victim] cannot file a violation of the [2012 order] because I got served on the same day." He did not suggest that he sent the letter before he was served, merely that he was confident she could not prove otherwise. When viewed in a light most favorable to the Commonwealth, however, the evidence was sufficient to prove otherwise.
Second, the defendant argues that there was no evidence that he made "contact" with the daughter in violation of the 2012 order because the victim intercepted the letter upon arrival and the daughter never saw it. In support, he cites to Commonwealth v. Cove, 427 Mass. 474 (1998). There, the court held that, even though the jury could have found that Cove placed two telephone calls to his estranged wife's place of employment, the element of "contact" was not met because there was no evidence "that a message had been left for her or anyone else, that the caller had reached her 'voice mail,' or even that she knew before trial that the calls had been made." Id. at 476. The defendant's reliance, however, is misplaced for two reasons. First, while the court in Cove noted the absence of evidence that the estranged wife was aware of the calls, it did not suggest that her awareness was required to establish a violation. Second, the evidence here established that the defendant intentionally wrote a letter to the daughter, mailed it to the address at which she resided, and that it subsequently arrived at that address. The victim also testified that she later told the daughter about the letter. Unlike in Cove, therefore, there was evidence that a message (the letter) was left, it reached the mailbox of a person protected under the 2012 order (the daughter), and the protected person was aware of it. The element of "contact" was established.
c. Intimidation of a witness. The defendant was convicted of intimidation of a witness, the victim, for (1) his mailings on various dates between January 1, 2009, and August 13, 2013, and (2) a letter he sent to her employer on January 9, 2013. This required proof that, among other things, he intended to impede, obstruct, delay, harm, or otherwise interfere with a criminal investigation or proceeding.[9] See G. L. c. 268, § 13B.[10] The defendant argues that such proof was lacking, again, in two respects.
First, he argues that he never demanded that the victim stop speaking to the police, and actually stated that he didn't care if she did. The statute, however, "does not require that a defendant specifically articulate a threat not to speak to the police or other criminal investigator.... A fact finder may evaluate the circumstances in which the statement was made ... to determine whether the defendant in fact intended to intimidate the victim." Commonwealth v. King, 69 Mass. App. Ct. 113, 120 (2007). Here, the defendant wrote things like, "I cannot believe that motherfuckas are still speaking my name to authorities," and, "[i]f motherfuckas did not want a confrontation, they should not have been filing complaints with the police or running their mouths." On other occasions, he suggested that all of his anger could be traced back to the filing of the Lawrence charges and the victim's failure to heed his warnings to withdraw them. Contrary to his assertion, therefore, the letters were replete with explicit or thinly-veiled threats regarding the victim's cooperation with authorities.[11]
Second, the defendant argues that there were no pending criminal investigations or proceedings that he could have intended to interfere with. Specifically, he notes that the Lawrence charges were dismissed on May 18, 2011. However, this argument "construes the statute too narrowly," as there is no bright line rule regarding the timing of an investigation. Id. at 121. Indeed, "[i]t is enough that the jury reasonably conclude from the surrounding circumstances that it was likely that the victim would furnish to an official investigating authority information pertaining to the crime and that the defendant intended to discourage such communication." Ibid. The letters reflect that the victim's communication with the police was an ongoing concern for the defendant. There also was evidence of pending criminal proceedings during the time period covered by the indictments, including the Lawrence charges and the various charges for violating the 2010 order. While some or all of those may have been dismissed at some point, that does not render them irrelevant.[12]
2. Inadvertent reference to stricken testimony. While instructing the jury regarding the defendant's alleged authorship of the mailings, the judge, after noting that the victim had testified that she recognized his handwriting and signature, inadvertently remarked, "and I believe there may have been some similar testimony from [the victim's mother]." The judge had previously excluded any such testimony. As there was no objection to the judge's remark, review is limited to the familiar substantial risk of a miscarriage of justice standard. See Commonwealth v. Dirgo, 474 Mass. 1012, 1016 (2016).
The Commonwealth's case, including the identification of the defendant as the source of the mailings, was overwhelming.[13] The error, meanwhile, was minor, especially in the context of the trial and instructions as a whole. After conducting the voir dire, the judge instructed the jury that if the victim's mother had said anything about recognizing the defendant's handwriting or signature (she had not), it was stricken and to be disregarded. During the charge, she reiterated that stricken evidence could not be considered, the jurors were the sole finders of fact, nothing she had said or done should be taken as her opinion of what the facts or outcome should be, and nothing she said during the charge was evidence. There is also no basis for inferring that defense counsel's failure to object was the result of a reasonable tactical decision. In the end, therefore, we are not left with "serious doubt whether the result of the trial might have been different had the error not been made." Commonwealth v. Azar, 435 Mass. 675, 687 (2002), quoting from Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).
3. Prior bad acts. Finally, the defendant argues that the judge erred by admitting evidence of prior bad acts (i.e., acts prior to 2009). He does not dispute that the evidence was relevant to multiple issues at trial, including his state of mind and motive, the victim's state of mind, and to provide context for their relationship and the things written in the letters. Nor does he take issue with the judge's instructions to the jury regarding the limited purposes for which such evidence was admitted. Instead, he argues that the evidence was so pervasive and extensive that its probative value was outweighed by the risk of unfair prejudice to him. "We review questions of admissibility, probative value, and unfair prejudice under an abuse of discretion standard.... We do not overturn a trial judge's decision on these issues absent a clear error of judgment in weighing the relevant factors." Commonwealth v. Rutherford, 476 Mass. 639, 649 (2017). We see no basis for reaching such a conclusion here. The judge gave informed and thoughtful consideration to the issue, both when ruling on the defendant's motion in limine and as the evidence came in at trial.[14]
Judgments affirmed.

The defendant was acquitted of a third count of intimidation of a witness.

The defendant does not contest the sufficiency of the evidence as to the charge of violating a restraining order through his mailings to the victim's mother.

The defendant claimed at one point that he had sent 150 similar letters "to people in the Haverhill community."

The charges had been nolle prossed in April, 2010, due to the cost of securing the defendant's return from Pennsylvania, and not due to any lack of proof.

The defendant dismissed restraining orders as "pieces of paper" that work only on people who, unlike him, fear the law, and suggested he could not be controlled by "the police, FBI, ATF, and all other [S]tate and [F]ederal agencies."

The charge also required proof that (1) the defendant wilfully and maliciously engaged in a knowing pattern of conduct or series of acts during the relevant time period, directed at the victim, which seriously alarmed or annoyed her and would cause a reasonable person to suffer substantial emotional distress, and (2) such conduct violated a G. L. c. 209A abuse prevention order. See § 43(a ) and (b ) ; Edge, supra.

The defendant also repeatedly expressed anger that the victim had called prison officials complaining about his mailings, which resulted in his loss of 274 days of "good time."

The Commonwealth also had to prove that (1) the defendant acted wilfully, (2) he directly or indirectly threatened, misled, intimidated, or harassed the victim on or between the given dates, and (3) she was (a) a witness or potential witness at any stage of a criminal investigation or proceeding, (b) aware of information that related to a criminal violation, or (c) furthering a criminal investigation. See G. L. c. 268, § 13B.

The statute was amended in 2010, see St. 2010, c. 92, § 11, and G. L. c. 256, § 120, but the changes did not affect the charges against the defendant.

A reasonable jury also could have inferred that, even when the defendant expressed ambivalence about the victim speaking to the police, he did so to convince her of the futility of doing so. Consider the following excerpt from one of his letters:
"Police cannot even get involved until I commit a crime and threatening to commit a crime is only a misdemeanor offense in the Commonwealth of Massachusetts, only punishable by a six month term. Get the police involved if you want to because I am not scared because when I come back, I will have 100 years to serve. I know that I will be back in as soon as I get out and that is the mentality yall should be worried about.... I am not mad because she cheated but because she didn't do what I say and go to the Lawrence courthouse."

The evidence, viewed in its entirety, demonstrated that, at the time the defendant mailed the letters he intended to discourage the victim from communicating with the authorities. The defendant argues that the letter to the victim's employer, a public school system, merely discussed her qualifications to teach and could not reasonably be interpreted as an act of witness intimidation. We disagree. The jury were free to view the letter, which was full of personal attacks and insults, in the context of the defendant's other mailings, including a prior threat he made, to interfere with her employment if she did anything to "try to discredit him" with the authorities.

The victim recognized the handwriting and signatures. The mailings also bore Pennsylvania postmarks, were consistent with other mailings the defendant admitted sending, and contained an error that the victim likely would not have made if she had fabricated them (i.e., the wrong zip code for her address).

We have also read the defendant's additional briefs brought pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208 (1981), and conclude that the arguments contained therein are unavailing.